Gabrielli, J.
Few legal issues have generated more public *328 or scholastic controversy, or produced as much passion among its debaters than that raised here. In the celebrated case of De Funis v Odegaard (416 US 312), amici curiae briefs, 26 in number, were submitted by some of the most pre-eminent legal experts, law professors and attorneys in the Nation. As most are aware, however, the Supreme Court did not decide the basic issue and the controversy continues unabated.[1] The parties here now raise the issue: Is "reverse” discrimination constitutional?[2]
Petitioner, a resident of Brooklyn, New York, and a magna cum laude graduate of Brooklyn College, was, at the commencement of this proceeding, a second-year graduate student participating in cancer research in the Department of Microbiology at the University of Southern California School of Medicine. He achieved an undergraduate grade point average of 3.47 and an undergraduate science average of 3.38. His postgraduate average in microbiology is 3.83. On the Medical College Application Test (MCAT), he scored 745 in science (99th percentile), 685 in general information (98th percentile), 645 in verbal (90th percentile), and 645 in qualitative (78th percentile). Petitioner applied for admission to the 1974-1975 class at respondent Downstate Medical Center, a publicly funded unit of the State university system. Following a personal interview, petitioner was notified that he was placed on a waiting list. However, when it became apparent that he would not be accepted by respondent, petitioner commenced this proceeding alleging that his qualifications for admission were superior to those of other applicants to whom respondent had arbitrarily granted preferential treatment in violation of the law. In response to his petition, respondent conceded in its answer that its admission policies were "responsive to the Eedical needs of the community’s large black and Puerto lean population.” However, it denied any violation of consti.tional rights and asserted that its policy and practice was "to insure consideration of all aspects which bear upon a candidate’s qualifications” for admission.
*329 At the hearing on respondent’s motion to dismiss the petition which, by later stipulation of the parties, constituted a trial of the issues, only two witnesses testified: Dr. Jerome P. Parnell, Chairman of the Admissions Committee for respondent, and petitioner. The facts as developed are undisputed.'
Respondent received 6,300 applications for the 216 positions in its 1974-1975 entering class. Initially, each application was given a "screening code”,[3] those scoring above 110 were automatically granted a personal interview, those scoring between 102 and 110 were preliminarly screened by the admissions committee and those scoring below 102 were automatically rejected. However, applications by persons claiming to be minority group members were preliminarily screened by the admissions committee irrespective of the screening code assigned to their application.
Petitioner’s screening code was 104 and he was one of 1,400 applicants actually interviewed. Of the 435 Black and Puerto Rican applicants, 145 were selected for interviewing. Thus, the average of Black and Puerto Rican applicants interviewed was 12% higher than other applicants. Following the interview, candidates were rated by the interviewer and those thought worthy of further consideration were presented to the admissions committee; all others were rejected. Thereafter, the interviewer would detail to the committee his reasons for recommending an applicant, and would circulate among the members a folder containing the candidates’ qualifications and interview sheet. Each member would then assign a numerical score between one and eight to the application and the average of these scores determined acceptances. Those receiving an 8.0 committee average were accepted immediately until there was no more room in the class, at which time, such remaining candidates would be put on the first waiting list. Those scoring 7.9 were put on a second waiting list and those scoring below 7.9 were rejected.
Dr. Parnell testified that in making their decision the committee members gave consideration to a variety of factors including whether the applicant was a minority group member and might be from a financially or educationally deprived *330 background.[4] Regarding the last factor, he added that the applications of all Blacks, Puerto Ricans, Mexican Americans or American Indians were specially marked in order that they might be more closely scrutinized on their interview to ascertain whether they were financially or educationally disadvantaged, and whether they were from "the ghetto area of Brooklyn”. He also stated that when a candidate was determined to be culturally deprived, the interviewer was expected to report this fact to the admissions committee which placed a high priority on that factor. Dr. Parnell further testified that while the committee had no express written or oral directive to give special preferences to minority applicants from the dean of the college, the Chancellor of the State University or the board of trustees of the college, the policy of the admissions committee regarding minority applicants was understood and well known to the faculty and dean of the college.
Prior to the selection of Dr. Parnell as Admissions Committee Chairman in 1970, respondent averaged no more than three minority students per class of 215. He testified, however, that since 1970 and, as a result of the present system for specially marking and considering minority applicants, the number of minority students per class has averaged 19 or 20; and that the change in admission practices was a direct result of the 1970 Report of the Association of American Medical Colleges Task Force to the Inter-Association Committee on Expanding Educational Opportunities in Medicine for Black and Other Minority Students. That report indicated that in 1970 only 2.2% of the physicians and 2.8% of the medical students in the United States were Black and that among the factors causing that situation were financial and educational obstacles, including cultural bias on the MCAT.
Dr. Parnell conceded that petitioner’s screening code was above the average score of the accepted minority applicants, and that had petitioner been a minority group member he probably would have been accepted. He explained, however, that due to the large number of applicants, qualitative achievement formed but a part of the committee’s consideration and that factors concerning the individual, as revealed in his interview, were far more important in the selection process.
*331 Respondent accepted 475 applicants, each of whom received an average committee rating of 8.0. An additional 131 candidates received 8.0 committee ratings and were placed on the first waiting list. Placed on a second waiting list were 128 candidates including petitioner who had been given a 7.9 committee rating. Petitioner was 84 on this list and, at the hearing, Dr. Parnell testified that it was very unlikely that petitioner would ever be accepted.
Overall, 66 minority applicants were accepted, 13 more were placed on the first waiting list and 6 on the second. Due to declinations or withdrawals, only 21 minority students actually preregistered for the 1974-1975 class. It is of interest to note that petitioner’s MCAT average of 680 was higher than every one of the accepted minority students.
Special Term adopted the test espoused by Mr. Justice Douglas in his dissent in De Funis (supra) and stated "that petitioner had the right to have his application considered in a racially neutral manner”,[5] but concluded, however, that respondent did not accept students based on their race but rather on their financial and educational disadvantage. Thus, the court found that respondent was neither arbitrary nor in violation of the Constitution by its admission policies and dismissed the petition. As an alternative ground for decision it was noted that petitioner’s standing to maintain the proceeding was questionable because even if all 21 accepted minority students were rejected, it was very unlikely that petitioner who was 84 on the second waiting list or 154 in line of priority, would have ever been accepted. The Appellate Division affirmed, without opinion.
Plaintiff’s sole claim is that respondent’s admission policies and practices in giving less qualified minority applicants a greater opportunity for acceptance is violative of the equal protection clause of the State and Federal Constitutions. In addressing any such constitutional claim, a threshold decision must first be made—the standard of review to be applied *332 (Montgomery v Daniels, 38 NY2d 41, 59). Plaintiff argues that for a racial classification, be it "benign” or "invidious”, to survive legal challenge the test to be applied is whether the classification can be "shown to be necessary” (Loving v Virginia, 388 US 1, 11) to the accomplishment of some legitimate "overriding statutory purpose” (McLaughlin v Florida, 379 US 184, 192). Put another way, petitioner urges us to apply the strict scrutiny test in reverse discrimination cases. This we may not do.
Traditional equal protection analysis is two tiered. Most classifications are subject to the lax standard of rationality which tests whether the challenged classification bears a reasonable relationship to some legitimate legislative objective. The test has been applied with great indulgence, especially in the area of economics and social welfare where, for example, it has been said that "[i]f the classification has some 'reasonable basis,’ it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality’ ”. (Dandridge v Williams, 397 US 471, 485; see Matter of Levy, 38 NY2d 653; Matter of Figueroa v Bronstein, 38 NY2d 533; Gleason v Gleason, 26 NY2d 28; Matter of Bauch v City of New York, 21 NY2d 599.) Indeed, in actual application the rejection of classifications under this test appear to be rare.
Where, however, a statute affects a "fundamental interest” or employs a "suspect” classification, the strict scrutiny test has been applied. That test requires that the legislative purpose be so compelling as to justify the means utilized. Identified as suspect are classifications based on alienage (Matter of Griffiths, 413 US 717; Sugarman v Dougall, 413 US 634; Graham v Richardson, 403 US 365), national origin (Hernandez v Texas, 347 US 475; Takahashi v Fish & Game Comm., 334 US 410, 418-420), and race (Loving v Virginia, 388 US 1, supra; McLaughlin v Florida, 379 US 184, supra). Fundamental interests include voting (Dunn v Blumstein, 405 US 330; Harper v Virginia Bd. of Elections, 383 US 663), travel (Shapiro v Thompson, 394 US 618), procreation (Skinner v Oklahoma, 316 US 535), the right of free speech (Police Dept. of Chicago v Mosely, 408 US 92), the right of a criminal defendant to appeal (Williams v Illinois, 399 US 235; Griffin v Illinois, 351 US 12) and, perhaps, the right of privacy (see Roe v Wade, 410 US 113; Eisenstadt v Baird, 405 US 438). Significantly, however, the Supreme Court has held that education is *333 not a fundamental interest (San Antonio School Dist. v Rodriguez, 411 US 1). Hence, if, as petitioner claims, strict scrutiny is to be invoked, it must be because this proceeding concerns a suspect racial classification, and not an education-related interest.
Where strict scrutiny is required, a painstaking inquiry is made to ensure the existence of a proper governmental objective. Thus, courts are vastly more circumspect of the relationship between the classification or interest and the legislative objective (see, e.g., Police Dept. of Chicago v Mosely, 408 US 92, 98-99, supra; Williams v Rhodes, 393 US 23); the desirability of the classification utilized is weighed against the importance of the State’s purpose in making the classification (see Loving v Virginia, 388 US 1, supra); and, finally, an examination may be conducted to determine whether less onerous alternatives exist (see Shelton v Tucker, 364 US 479, 488). In short, the issue for determination is whether a compelling State interest is necessarily being^promoted (see, e.g., Loving v Virginia, 388 US 1, supra). Theburden imposed on the State is a very heavy one. Indeed, in only two cases has governmental action surpassed strict scrutiny and in both instances the justification was national security (Korematsu v United States, 323 US 214; Hirabayashi v United States, 320 US 81).
The inflexibility of the traditional equal protection approaches is readily apparent for each is polarized and outcome-determinative. Modern day theorists, led by Professor Gerald Gunther (see Gunther, The Supreme Court 1971 Term —Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev l)[6] have detected a departure from the traditional approaches in recent precedent and argue, convincingly we think, that a middle level of review presently exists. Indeed, one member of the Supreme Court has candidly stated that this is already the case, viz.:
"A principled reading of what this Court has done reveals that it has applied a spectrum, of standards in reviewing discrimination allegedly violative jrf the Equal Protection Clause. This spectrum clearly comprehends variations in the degree of care with which the CourtTWill scrutinize particular *334 classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn. I find in fact that many of the Court’s recent decisions embody the very sort of reasoned approach to equal protection analysis for which I previously argued—that is, an approach in which 'concentration [is] placed upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification.’ Dandridge v. Williams, supra, at 520-521 (dissenting opinion).” (San Antonio School Dist. v Rodriguez, 411 US 1, 98-99, supra [Marshall, J., with whom Douglas, J., concurred, dissenting].)[7]
Although a majority of the Supreme Court has not expressly abandoned the two-tiered approach, the court has at least varied, if not wholly changed, the application of the tests. Thus, while purporting to apply traditional standards, the court has recently held several State and Federal acts violative of equal protection even though rational reasons for their enactment were proferred (see Stanton v Stanton, 421 US 7; Jimenez v Weinberger, 417 US 628; James v Strange, 407 US 128; Eisenstadt v Baird, 405 US 438, supra; Reed v Reed, 404 US 71). Therefore, we do not feel constrained to apply either traditional test but instead are ready to adopt middle ground tests in situations where such review is warranted (cf. Montgomery v Daniels, 38 NY2d 41, 61, supra).
We turn now to decide the proper test to be applied here.
The Fourteenth Amendment was adopted to guarantee equality for Blacks, and by logical extension has come to include all minority groups. Thus, strict scrutiny of racial classifications is clearly warranted in order that its mandate be carried forth (see, e.g., Loving v Virginia, 388 US 1, supra; McLaughlin v Florida, 379 US 184, supra; Griffin v Maryland, 378 US 130; Pennsylvania v Board of Trusts, 353 US 230). Additionally, the amendment has been interpreted as permitting, if in fact not requiring, the correction of historical invidious discriminations (Swann v Board of Educ., 402 US 1; United States v Montgomery County Bd. of Educ., 395 US 225; Brown v Board of Educ., 347 US 483).[8] It would indeed be *335 ironic and, of course, would cut against the very grain of the amendment, were the equal protection clause used to strike down measures designed to achieve real equality for persons whom it was intended to aid. We reject, therefore, the strict scrutiny test for benign discriminations as, in our view, such an application would be contrary to the salutary purposes for which the Fourteenth Amendment was intended.
It has also been suggested that the rational basis test be applied in reverse discrimination cases because "it is not 'suspect’ in a constitutional sense for a majority, any majority, to discriminate against itself’ (Ely, The Constitutionality of Reverse Racial Discrimination, 41 U of Chi L Rev 723, 727). In short, the argument is made that the majority can be trusted when it discriminates against itself. Additionally, it is asserted that the stigma arising from benign discrimination is far less substantial than that resulting from malign classifications and, thus, the concerns such as were expressed in Brown v Board of Educ. (347 US 483, 493-494, supra) are not present (Ely, op. cit., p 730). These contentions, superficially viewed, appear potent. On analysis, however, several untoward consequences are readily apparent. Granting preferential treatment] to some racial groups encourages polarization of the races./ Likewise, such treatment perpetuates thinking in racial terms and tends to undermine the incentive among those in the discriminated group to strive to improve their lot. Conversely, preferential treatment causes those advanced by such assistance to be held in lower esteem and thought less qualified by those who have advanced without State-sponsored advantages. Moreover, and significantly, racial preferences require extremely difficult racial determinations, for example: who is a minority group member and who is not? What races are to be favored? And, on the basis of what criteria are decisions to be made? Hence, preferential treatment programs involve perpetuating undesirable perceptions of race as' criteria affecting State action (Greenawalt, op. cit., 75 Col L Rev 559, 571-572; *336 see, also, Lavinsky, De Funis v Odegaard: The "Non-Decision” with a Message, 75 Col L Rev 520, 526-528) and, therefore, should be subjected to more careful scrutiny than traditional standards of rationality ordinarily invoke.
We are of the view that in deciding an issue of whether reverse discrimination is present, the courts should make proper inquiry to determine whether the preferential treatment satisfies a substantial State interest. In determining whether a substantial State interest underlies a preferential treatment policy, courts should inquire whether the policy has a substantial basis in actuality, and is not merely conjectural. At a minimum, the State-sponsored scheme must further some legitimate, articulated governmental purpose. However, the interest need not be urgent, paramount or compelling. Thus, to satisfy the substantial interest requirement, it need be found that, on balance, the gain to be derived from the preferential policy outweighs its possible detrimental effects.[9]
If it be found that the substantial interest requirement is met, a further inquiry must be made as to whether the objectives being advanced by the policy could not be achieved by a less objectionable alternative; for example, by reducing the size of the preference, or by limiting the time span of the practice. Additionally, where preference policies are indulged, the indulgent must be prepared to defend them. Courts ought not be required to divine the diverse motives of legislators, administrators or, as here, educators.
In sum, in proper circumstances, reverse discrimination is constitutional. However, to be so, it must be shown that a substantial interest underlies the policy and practice and, *337 further, that no nonracial, or less objectionable racial, classifications will serve the same purpose.
In so concluding we do not intend to limit the discretion normally reposed in college administrators to determine who shall be admitted to their institutions. Courts should continue to refrain from interfering in such decision-making processes (see Matter of Lesser v Board of Educ. of City of N. Y., 18 AD2d 388, 390). Indeed, by legislative fiat the institutions alone are empowered "[t]o regulate the admission of students” ) (Education Law, § 355, subd 2, par i). Nonetheless, where j benign or malign discrimination is practiced outside the bounds of constitutional limits, judicial vigilance and intervention, however undesirable, are required.
On the other hand, however, our recognition that benign discrimination is permissible should not be taken as tacit approval of such practices. We reiterate that preferential policies, laudable in origin and goal, may be laden with substantial detrimental side effects which make their use undesirable. If such practices really work, the period and extent of their use should be temporary and limited for as goals are achieved, their utilization should be diminished. Conversely, if no improvement is noted, consideration should be given to the discontinuation of the practice.
Upon the record before us we think that petitioner demonstrated that race was considered by respondent in its admissions determinations. It was shown that race was a vital and determinative consideration in the preliminary screening process inasmuch as some minority applicants receiving a screening code of less than 102 were interviewed and thereby made eligible for acceptance whereas all nonminority applicants with similar low codes were automatically rejected and not given an interview. Respondent concedes that an applicant’s race was an important factor in the admissions committee’s weighing process and that there was an admitted, albeit unstated, effort to address perceived racial imbalances in the student body of the college and to aid minority students from the local community. Moreover, the evidence reflecting the^ dramatic increase in minority admissions for 1970 through 1975 as compared with prior periods lends some measure of support to the conclusion that race was a significant factor in respondent’s admission policy and practices (cf. State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201). y
Although this record is somewhat sparse in content, we *338 think petitioner has established, in essence, that respondent practiced reverse discrimination. However, we need not proceed further, as we ordinarily might, to inquire whether less objectionable alternatives exist, since petitioner failed to establish a prima facie case of discrimination as it relates to this case in that he failed to show his own right to relief, even if the entire minority program were eliminated. Petitioner was 154 on the priority list.[10] Even if all 21 accepted or registered minority students plus the 19 minority students on the two waiting lists were declared ineligible for admission to the college, petitioner would still not be entitled to a position in the class since 114 students would still have priority over him. We conclude, therefore, as did the courts below, that petitioner did not establish a right to relief and thus the petition should be dismissed.
We do not in any sense hold that petitioner lacks standing to maintain this proceeding. Rather, we hold only that upon this record he has not demonstrated his ultimate right to obtain relief. Indeed, it is only as a consequence of the present litigation that the minority program has been explored and that his actual predicament has been demonstrated; in the procedural posture and circumstances of this case, the fact that petitioner was not ultimately entitled to relief was not disclosed prior to the hearing on the merits. Standing to seek judicial review does not depend on a threshold demonstration of the narrower, final right to an individual remedy (see, e.g., Burke v Sugarman, 35 NY2d 39, 44). Hence, although petitioner had standing, in the final analysis he failed to demonstrate that he, personally, suffered any legal harm as a result of respondent’s student selection process.
Finally, the argument that the addition of minority applito the pool of eligible candidates operated to reduce the arithmatical chance that petitioner would be admitted must be rejected. Uncontroverted evidence was adduced to the effect that nonminority applicants were not prejudiced vis-á-vis each other by the consideration given minority applicants and that were rated on their individual merit without regard to minority candidates. Thus, by eliminating minority persons from the total students accepted or placed on waiting lists, petitioner’s relative standing with respect to the nonminority *339 applicants is maintained and his likelihood of acceptance was therefore not reduced so as to allow him properly to assert a claim of harm.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed, without costs.

. (See, e.g., De Funis Symposium, 75 Col L Rev 483; Symposium—De Funis: The Road Not Taken, 60 Va L Rev 917.)

. "Reverse” discrimination, also called "benign” discrimination, may be defined as classifications that are designed to assist selected groups of persons presumed or shown to be disadvantaged (see Greenawalt, Judicial Scrutiny of "Benign” Racial Preference in Law School Admissions, 75 Col L Rev 559, n 4). In a somewhat broader and more coarse context, the term "affirmative action” is utilized (see Karst and Horowitz, Affirmative Action and Equal Protection, 60 Va L Rev 955, n 1).

. The "screening code” is computed by adding the sum of (1) the average of an applicant’s undergraduate science and nonscience grade point averages multiplied by 20, (2) his average MCAT score multipled by .05, and (3) by adding one point if the applicant is a resident of New York.

. Apart from asking a candidate to indicate on the application whether he desired to be considered as a minority group applicant, apparently no effort was made to determine whether any person was indeed a member of such group.

. Mr. Justice Douglas wrote: "There is no constitutional right for any race to be preferred. The years of slavery did more than retard the progress of Blacks. Even a greater wrong was done the whites by creating arrogance instead of humility and by encouraging the growth of the fiction of a superior race. There is no superior person by constitutional standards. A DeFunis who is white is entitled to no advantage by reason of that fact; nor is he subject to any disability, no matter his race or color. Whatever his race, he had a constitutional right to have his application considered on its individual merits in a racially neutral manner.” (416 US, at pp 336-337, supra.)

. (See, also, Nowak, Realigning the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications, 62 Geo L J 1071; Gellhorn and Hornby, Constitutional Limitations on Admissions Procedures and Standards—Beyond Affirmative Action, 60 Va L Rev 975, 985-988.)

. In a concurring opinion in Vlandis v Kline (412 US 441, 456), Mr. Justice White virtually indorsed Justice Marshall’s analysis.

. The weight of decisional authority in employment discrimination actions hold *335 constitutional the imposition of racial quotas to remedy historical racial bias (see Boston Chapter NAACP v Beecher, 504 F2d 1017, cert den 421 US 910; Patterson v Newspaper & Mail Deliverers’ Union, 514 F2d 767; Porcelli v Titus, 431 F2d 1254, cert den 402 US 944; Morrow v Crisler, 491 F2d 1053, cert den 419 US 895; Reed v Arlington Hotel Co., 476 F2d 721, cert den 414 US 854; but see Harper v Kloster, 486 F2d 1134; Lige v Town of Montclair, 134 NJ Super 277; Kirkland v New York State Dept. of Correctional Servs., 520 F2d 420; see, generally, Blumrosen, Quotas, Common Sense, and Law in Labor Relations: Three Dimensions of Equal Opportunity, 27 Rutgers L Rev 675).

. We note with some interest the possible sustaining and countervailing rationale offered by the commentators on the merits of the controversy (see De Funis Symposium, 75 Col L Rev 483; .Symposium—De Funia: The Road Not Taken, 60 Va L Rev 917; Symposium, 1970 Toledo L Rev 377; Bell, in Defense of Minority Admissions Programs: A Response to Professor Graglia, 119 U of Pa L Rev 364; Fiss, The Pate of an Idea Whose Time Has Come: Antidiscrimination Law in the Second Decade after Brown v Board of Education, 41 U of Chi L Rev 742; Gellhorn, The Law Schools and the Negro, 1968 Duke L J 1069; Graglia, Special Admissions of the "Culturally Deprived” to Law School, 119 U of Pa L Rev 351; Hughes, Reparations for Blacks?, 43 NYU L Rev 1063; Morris, Equal Protection, Affirmative Action and Racial Preferences in Law Admissions, 49 Wa L Rev 1; O’Neil, Equalizing the Access of Minority Groups to Higher Education, 80 Yale L J 699; Vieira, Racial Imbalance, Black Separatism, and Permissible Classification by Race, 67 Mich L Rev 1553; see, also, Bickel, The Least Dangerous Branch, pp 222-228; Bittker, The Case for Black Reparations).

. At the time of the hearing, 60 applicants had been accepted from the first waiting list leaving 71 more eligibles, in addition to the 83 applicants ahead of petitioner on the second waiting list.