*65 OPINION OF THE COURT
Margaret Taylor, J.
Respondent P. is a 14-year-old female. She is before this court on the complaint of D.
The petition alleges, inter alia,[1] that "Respondent did offer to perform a deviate sexual act for U.S. currency”, an act which, if committed by an adult, would constitute the crime of prostitution (Penal Law, § 230.00, a class B misdemeanor).
Paragraph 10 of the bill of particulars of the Corporation Counsel describes the incident as follows:
"On March 6, 1977, at about 8:30 p.m., respondent accosted complaining witness on the street and offered to engage in sexual acts with him for a fee of $10; he agreed and respondent took him to the Evans Hotel, 273 West 38th Street, New York City. Complaining witness paid $4 for the use of a room and went there with respondent.”
It should be noted that the complaining witness was not charged with the violation of patronizing a prostitute (Penal Law, § 230.05).[2] Nor was he charged with any other crime applicable to these facts.[3]
Section 230.00 of the Penal Law reads: "A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee.”
A deviate sexual act is defined by subdivision 2 of section 130.00 of the Penal Law as: " 'Deviate sexuál intercourse’ means sexual conduct between persons not married to each other consisting of contact between the penis and the anus, the mouth and penis, or the mouth and the vulva.”
Deviate sexual intercourse, also a class B misdemeanor, is made a crime under section 130.38 of the Penal Law: "Consensual Sodomy. A person is guilty of consensual sodomy when he engages in deviate sexual intercourse with another person.”
Under the Family Court Act, the court can find that a respondent is a juvenile delinquent only if (a) the court finds *66 beyond, a reasonable doubt (Family Ct Act, § 744, subd [b]) that "the respondent did any act which, if done by an adult, would constitute a crime” (Family Ct Act, § 731, subd 1, par [a]; § 752) and (b) "the respondent requires supervision, treatment, or confinement”. (Family Ct Act, § 731, subd 1, par [c]; § 752.) Both of these findings are jurisdictional and, therefore, a failure to find both elements requires dismissal of a juvenile delinquent petition. (Family Ct Act, § 751.)
The threshold question in all juvenile delinquency proceedings is, therefore, not whether a respondent committed a particular act but whether such an act would be a crime if committed by an adult. If not, then the court can go no further and must dismiss the petition. Accordingly, if acts committed by an adult would not constitute a crime because the criminal statute or statutes making such alleged acts a crime were unconstitutional, such acts could not be the basis for a charge of juvenile delinquency. A youth under the age of 16 may be found to be a juvenile delinquent only if an adult who engaged in the same conduct as the youth could be found to have committed a crime. If a statute is unconstitutional as applied to adults, a statute is unconstitutional as applied to juveniles. (See Matter of Gault, 387 US 1.)
Inasmuch as the petition alleges that the respondent offered to perform an act of consensual sodomy for a fee, the charges brought against respondent necessarily invoke the prostitution statute (PenaLLaw, § 230.00) and the consensual sodomy law (Penal Law, §§ 130.38; 130.00, subd 2). Respondent is specifically charged with offering to perform a "deviate” sexual act for a fee. If she had been charged with offering to perform a "normal” sexual act (i.e., fornication) for a fee, it would have been necessary for the court to deal with the question of whether a crime can be committed by offering to perform a sexual act, which in and of itself is not illegal, for money.[4] Here, however, respondent is charged with offering to perform an act which in and of itself is proscribed by a criminal statute, the consensual sodomy law (Penal Law, §§ 130.38; 130.00, subd 2). It is necessary, therefore, for the court to examine those sections of the Penal Law and make a determination as to their constitutionality.
*67 Respondent, by her attorney, has moved to dismiss the prostitution charge on constitutional and other grounds.[5] For the reasons stated below, the court holds that sections 230.00, 130.38 and 130.00 (subd 2) of the Penal Law are unconstitutional under the New York State Constitution in that these statutes constitute a denial of equal protection and invade respondent’s constitutionally protected right of privacy.
Section 11 of article I of the New York State Constitution guarantees that: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof.”
This provision provides at least as broad protection as its Federal counterpart. (Dorsey v Stuyvesant Town Corp., 299 NY 512, 544 [Fuld, J., dissenting]; Town of Greenburgh v Board of Supervisors of Westchester County, 53 Misc 2d 88; People v Reilly, 85 Misc 2d 702. See 2 Rev Record of New York State Constitutional Convention at 1965 [1938].)
The equal protection clause is offended when the State discriminates between classes of citizens similarly situated on arbitrary and unreasonable grounds not related to the objective of the legislation. (Matter of Patricia A., 31 NY2d 83.)
The selective enforcement of a law against a particular class of individuals on the basis of sex is no less offensive to the equal protection clause of the New York State Constitution than classification by sex on the face of the statute. (Yick Wo
*68 v Hopkins, 118 US 356; People v Walker, 14 NY2d 901; People v Utica Daw’s Drug Co., 16 AD2d 12.)
Sex is a suspect classification in New York State. (Matter of Ogilvie, 83 Misc 2d 896; People v Moss, 80 Misc 2d 633; People v Overton, 88 Misc 2d 531. See Matter of Malpica-Orsini, 36 NY2d 568, 591; Matter of Sontag v Bronstein, 33 NY2d 197, 201 n 2; Frontiero v Richardson, 411 US 677 [Justices Brennan, Douglas, White and Marshall].) Thus, sections 230.00 and 230.05 as applied are subject to strict scrutiny.
However, as the Court of Appeals notes, "The inflexibility of the traditional equal protection approaches is readily apparent for each is polarized and outcome-determinative. Modern day theorists * * * have detected a departure from the traditional approaches in recent precedent and argue, convincingly we think, that a middle level of review presently exists.” (Alevy v Downstate Med. Center, 39 NY2d 326, 333.)
The middle level of review adopted in Alevy requires that a court examine such factors as the classification involved, the constitutional and societal importance of the interests adversely affected and the relative invidiousness of the basis upon which the classification is drawn. This court has no interest in adopting an outcome-determinative test when it is faced with these controversial challenges to the prostitution and consensual sodomy laws. Thus, all the afore-mentioned facts will be considered when examining the constitutional challenges raised.
Until 1964, a prostitute was defined as a "female person”. (See Roby, Politics and Criminal Law: Revision of the New York State Criminal Law on Prostitution, 17 J Soc Problems No. 1, p 83 [1972].) The Legislature amended the penal law to make the prostitution statute sex neutral in its wording and it enacted a statute proscribing the act of patronizing a prostitute. (Penal Law, § 230.05; L 1965, ch 1030, eff Sept. 1, 1967.) Although the prostitution laws were made facially sex neutral, their historical sex bias has endured.
Prostitution is a class B misdemeanor, carrying a penalty of « up to 90 days’ imprisonment. A person may be found guilty of prostitution for simply "agreeing” to perform a sexual act, even if the patron is the solicitor. In contrast, patronizing a prostitute is merely a violation carrying a penalty of up to 15 days’ imprisonment or up to $250 fine. (Penal Law, § 230.05.) The conduct engaged in by the prostitute and the patron is *69 nearly identical and the wording of the respective statutes is quite similar.
The instant case presents clear evidence of intentional selective enforcement of the prostitution statutes against females.[6] The overwhelming majority of arrests made under section 230.00 of the Penal Law are of female prostitutes. During the first six months of 1977, 3,219 arrests were made in New York County under this statute. Of those arrested, 2,944 were females and only 275 were males.[7] Of equal importance is the fact that although 3,219 arrests were made for prostitution, only 62 persons were charged with patronizing a prostitute. Of the 2,944 female prostitutes arrested, only 60 of their male patrons were charged with a violation.[8] This data supports the conclusion that those assigned the task of enforcing the law harbor the attitude that women who supply sex are immoral whereas the men who demand their services are considered blameless. (See The Politics of Prostitution, p 6.)
The methods of enforcement used by the police contribute to the selective enforcement of the prostitution laws against females. Arrests for prostitution are rarely made on the complaint of a private citizen. A police officer must be directly solicited to make an arrest. Male undercover police officers are assigned to pose as patrons to entrap streetwalkers. However, female plainclothes officers are not presently assigned to pose as prostitutes to entrap male patrons. (NY Times, Nov. 16, 1977, p D17, col 5; Cooney and Quint, supra, pars 9, 12-B;
*70 Politics of Prostitution, supra, pp 28-29, 54-55.) Thus, the method of enforcement of the prostitution laws is sex biased, aimed only at punishing the female prostitute.[9]
Thus, the court concludes that even were sex not a "suspect classification”, the prostitution statutes nonetheless violate the equal protection clause. There is no, nor has the Corporation Counsel suggested any, reasonable justification for penalizing the conduct of female prostitutes more severely than the conduct of their male patrons.[10] The prostitution laws have undeniably been selectively enforced against females because of their sex. Discrimination by the State between different classes of citizens, "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.” (Matter of Patricia A., 31 NY2d 83, 88 supra.)
This court can find no real difference between the conduct of the prostitute and the patron. The patron pays and the prostitute receives compensation for her services. Yet, under *71 the wording of the statute and frequently in practice, the patron may be the solicitor.[11]
As a court of this State observed over 50 years ago: "The men create the market; and the women who supply the demand pay the penalty. It is time that this unfair discrimination and injustice should cease * * * The practical application of the law as heretofore enforced is an unjust discrimination against women in the matter of an offense which, in its very nature, if completed, requires the participation of men.” (People v Edwards, 180 NYS 631, 634-635.)
To the extent prostitution may cause a public nuisance by reason of offensive conduct on the streets or congested traffic,[12] such nuisance is caused by prostitute and patron alike. The Corporation Counsel does not dispute and the facts of the instant case amply demonstrate[13] that the prostitution laws are selectively enforced against the female participant. The male patron and female prostitute are equal partners in commercial sex. This court can find no legitimate distinction between their conduct. Such intentional and selective enforcement of these laws almost exclusively against females because
*72 of their sex violates the equal protection clause of the New York State Constitution. (Accord, People v Utica Daw's Drug Co., 16 AD2d 12, supra.)
The respondent is charged with offering to perform a "deviate” sexual act for a fee. As indicated above, it is necessary, therefore, for the court to examine section 130.38 and subdivision 2 of section 130.00 of the Penal Law and make a determination as to their constitutionality.
The Penal Law only makes unlawful acts of "deviate” sexual intercourse performed by unmarried persons, whether of the opposite or same sex. Thus, the consensual sodomy statute creates a distinction between the private consensual sexual conduct of married and unmarried persons.[14]
As will appear more fully below, the private consensual sexual relations of married and unmarried persons involve a fundamental right of privacy protected by the New York State Constitution. (Griswold v Connecticut, 381 US 479; Eisenstadt v Baird, 405 US 438; Stanley v Georgia, 394 US 557; Roe v Wade, 410 US 113; Carey v Population Servs. Int., 45 USLW 4601 [June 9, 1977]; People v Johnson, 77 Misc 2d 889; People v Shreve [County Ct, Chautauqua County, Oct. 21, 1975]. See People v Rice, 41 NY2d 1018, affg 87 Misc 2d 257, revg 80 Misc 2d 511.) The right of privacy does not attach to the marital relationship but to the individuals involved. (Accord, e.g., Eisenstadt, supra; see Matter of Labady, 326 F Supp 924.)
Since a fundamental interest involving life or liberty is involved in this challenge to the constitutionality of the consensual sodomy statute, this court will carefully examine the State interests claimed to be protected by the criminalization of consensual sodomy between unmarried adults. (See Alevy v Downstate Med. Center, 39 NY2d 326, supra; Carey v Population Servs. Int., supra.) The court will not accept mere claims that "deviate” sexual intercourse is harmful and, therefore, is properly proscribed by a State statute. On the contrary, it must be demonstrated that consensual sodomy in fact harms the public health, safety or welfare. (See Penal Law, § 1.05.)
It cannot be said that acts of deviate sexual intercourse are, in and of themselves, intrinsically harmful or unnatural, causing in the participants any deviation from fundamental *73 human nature.[15] Since 1968, when the consensual sodomy law was amended, married persons in this State have been permitted to engage in "deviate” sexual intercourse without criminal sanction. In these past nine years, no empirical evidence that consensual sodomy is intrinsically harmful has been produced. Such conduct may be freely engaged in by married persons without sanction and is a widely accepted form of sexual expression.[16] In this State, affectional or sexual preference has not been found to be a controlling factor in matters of licensing,[17] citizenship,[18] or admission to the Bar.[19]
Since it cannot be demonstrated that there is anything intrinsically harmful in acts of consensual sodomy between unmarried adults, can section 130.38 of the Penal Law be legitimated as a mode of protecting the stability of marriage and the family? There is no empirical evidence that so-called "deviate” sex, an activity that has been engaged in for centuries, has been a factor of any significance affecting the stability of marriage and the family. On the contrary, in the 17 States where consensual sodomy has been decriminalized,[20] *74 and the 100 nations that permit consensual sodomy, co-operative social institutions like the family remain stable. (See Richards, Unnatural Acts and the Constitutional Right to Privacy: A Moral Theory, 45 Fordham L Rev 1281 (1977); Woolfenden, Report of the Commission on Homosexual Offenses and Prostitution, British Home Office, par 287, p 96.)
The court has searched for, but cannot find, a proper governmental objective served by the Legislature in distinguishing between the marital status of persons engaging in so-called "deviate” sexual intercourse. Completely lacking is any evidence that the conduct proscribed is more harmful to unmarried participants or that such conduct between unmarried persons is more harmful to the public.
If the consensual sodomy law were designed to prevent sexual relations between unmarried people, then "normal” sexual relations between the unmarried would also be sanctioned by the criminal law. Fornication, however, is not a crime in this State. If the purpose of the law is to promote conventional sex it also fails in its objective since married persons are permitted to engage in unconventional or "deviate” sexual conducts Thus, if morality vis-á-vis sexual norms or the promotion of marriage are the objectives of the legislation, there is no rational, let alone substantial, relationship between the law itself and these legislative ends. There is no logical or factual basis on which the marital status of the participants should be decisive as to whether a mode of sexual conduct is legal or criminal. Since the classification created by section 130.38 and subdivision 2 of section 130.00 of the Penal Law as incorporated therein has no rational basis, the criminalization of "deviate” sexual intercourse between persons who are not married to each other is an unconstitutional denial of equal protection of the laws. (Accord, People v Johnson, 77 Misc 2d 889, supra; People v Shreve County Ct, Chautauqua County, supra.)
As the framers of the Federal and New York State Constitutions realized, a tension exists between the rights and powers of the government as opposed to those rights reserved to the People. As the Supreme Court observed nearly a century ago: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference from others, unless by clear and un *75 questionable authority of law.” (Union Pacifc Ry. Co. v Botsford, 141 US 250, 251.)
It is the Bill of Rights that stands between the will of the majority and the individual. It declares that except in the direct pursuit of protecting the public health, safety or morals, the State may not interfere with the individual’s right of self-expression. As numerous commentators have noted, the right of privacy found in the Bill of Rights has, as its underpinnings, the concept that affording the maximum amount of opportunity for individual choice maximizes the ability of each person for self-development.
Running counter to the majoritarian tide of laws is the Bill of Rights’ protectipn of diversity and guarantee of opportunity for the disadvantaged, who are unable to gain redress through the political process, to gain expression of and protection for their views in the courts. (See Wilkinson and White, Constitutional Protection for Personal Lifestyles, 62 Cornell L Rev 563; Richards, Unnatural Acts and the Constitutional Right to Privacy: A Moral Theory, supra.)
The Supreme Court only recently recognized in the Bill of Rights a right of privacy. (Griswold v Connecticut, 381 US 479, supra.) But the parameters of this right are quickly being revealed. The right of privacy encompasses not just sexual conduct in the marital relationship but is broad in scope, including in its protection each individual’s decision as to whether, when and in what manner he or she will engage in private intimate relations. (Eisenstadt v Baird, 405 US 438, supra [the right of unmarried as well as married individuals to engage in nonprocreative sexual conduct]; Stanley v Georgia, 394 US 557, supra [private possession of obscene materials for autoerotic purposes]; Roe v Wade, 410 US 113, supra [a woman’s right to an autonomous choice as to whether to obtain an abortion within the first two trimesters of her pregnancy or, in the alternative, to choose to enter into a new love relationship with her child]; and, most recently, Carey v Population Servs. Int., 45 USLW 4601, supra [minor’s right to engage in nonprocreative, private, intimate relations].) The mantle of constitutional protection surrounding personal intimacy is not, therefore, limited to married persons. It attaches to the individual not the relationship, and protects the individual’s right to engage in nonprocreative, recreational sex. (Id. see Halleck [Judge, D.C. Super Ct] Legal Regulation of Commercial Sex: A Survey (1973 proceedings of the 19th Ann. *76 Conference of Sex, Information, Education and Counseling for the United States.)
Just as there is no express right to privacy included in the Federal Constitution, the New York State Constitution’s protection of the right of privacy is not found on the face of that document but emanates from such protections as liberty of speech (NY Const, art I, § 8), the right to be free from unreasonable searches and seizures (NY Const, art I, § 12) and the guarantee of due process of law (NY Const, art I, § 6). The Court of Appeals has most recently recognized the applicability of the right of privacy under the New York Constitution to the issue of unwarranted governmental interference in private consensual sodomy. (People v Rice, 41 NY2d 1018, supra.)[21]
With the foregoing explication of the existence of the right of privacy under the New York State Constitution and the philosophical underpinnings of this right, this court states at the outset the premise that private, intimate, consensual sexual conduct not harmful to others, even if it violates the personal moral code of many, does not violate public morality and is protected by the right of privacy. (Matter of Labady, 326 F Supp 924, supra [granting the naturalization petition of a homosexual man who participated in purely private, consensual acts of sodomy].) In determining whether the State has a legitimate interest in proscribing private consensual sexual conduct, "deviate” or "normal”, the following questions must be dealt with:
(1) . What harm does such conduct pose to the public health, safety or morals?
(2) . Is there harm in fact? Can harm actually or empirically be shown?
*77 (3) . Is the harm caused in fact by the proscribed conduct?
(4) . Is the legislation reasonably related to the State’s legitimate objective or is the relationship between the protectible public interest and the proscribed conduct too attenuated?
This court will not accept at face value bald claims of harm to the public health, safety and morals, but will closely examine the reasonableness of the State objectives proffered by the Corporation Counsel. (New York State Soc. of Med. Masseurs v City of New York, 74 Misc 2d 573; Eisenstadt v Baird, 405 US 438, 448, supra.)
In discussing above the equal protection challenge to the consensual sodomy statutes, this court discussed the harms to the public health, safety or welfare allegedly caused by "deviate” sexual intercourse. Assertions that "deviate” sexual intercourse is intrinsically harmful to the participants or that it has a deleterious effect on the moral fibre of the community by undermining the stability of marriage and the family were each shown to be unsubstantiated. Although other courts argue that the Bible prohibits "deviate” sexual conduct and, therefore, such conduct is immoral (Doe v Commonwealth’s Attorney, 403 F Supp 1199, affd 425 US 901, supra), it is this court’s view that absent empirical evidence demonstrating that private, consensual "deviate” sexual acts cause harm in fact to the public health, safety or welfare the State may not legitimately proscribe such conduct. (See Penal Law, § 1.05.) Since there is no proof that public harm is caused by consensual sodomy, the government may not intrude in private, personal decisions regarding sexual preference.
Since it has been demonstrated that there is no legitimate basis for governmental interference in private, consensual sodomy, the balance of this opinion will deal with the remaining question of whether the State may legitimately proscribe commercial, recreational sex.
It is claimed that prostitution is indeed harmful in that it spreads disease, leads to ancillary criminal conduct, encourages criminal organization and generally may be characterized as antisocial behavior both offensive and injurious to the community.
It is urged' that prostitution spreads venereal disease. Without question, venereal disease is a serious threat to public health and it has apparently now reached epidemic proportions. However, all empirical data supports the conclu *78 sion of Dr. Charles Winnick of the City University, president of the American Social' Health Association, that "[T]he amount of venereal disease attributable to prostitution is remaining fairly constant at a little under 5%, which is a negligible proportion compared to the amount of venereal disease we now have.” (Cooney and Quint, Prostitution in New York City: Answers to Some Questions, par 7. Accord, Letter from J.D. Millar, M.D., Chief, V.D. Branch, H.E.W. Center for Disease Control, May, 1972 [less than 3% of those persons with syphilis are prostitutes]; United States Department of Health Education and Welfare, V.D. Fact Sheet: Basic Statistics on the Venereal Disease Problem in the United States; James & Burnstin, Prostitution in Seattle, Washington State Bar News, 8 [Aug.-Sept., 1971] [less than 1% of all female prostitutes examined had infectious syphilis and less than 6% had gonorrhea].)[22] Thus, a negligible amount of venereal disease is caused in fact by prostitution. The State may have a legitimate interest in seeking to eradicate even this small incidence of disease, but the attenuated relationship between prostitution and venereal disease emphasizes that it would be unreasonable to prohibit all prostitution for the sake of eradicating 5% of the "VD” health hazard.[23]
It is also claimed that prostitution leads to other crimes. Indeed, in this case respondent is also charged with acts which could constitute robbery and assault in the second degree if committed by an adult. Nonetheless, the Corporation Counsel has not come forward with any empirical evidence substantiating that prostitution is the cause-in-fact of ancillary crime. *79 Indeed, it has been concluded by numerous social scientists that crimes ancillary to prostitution are a by-product of the environment to which society consigns prostitution.
"The effects of the enforcement procedures on the prostitute clearly are negative. Jail is not a deterrent. It often encourages criminal conduct. Incarceration contributes little to rehabilitation while teaching the prostitute about genuine criminal activity. She learns that other more serious crimes may pay better; she begins to view herself as a criminal. Attaching the label "criminal” to prostitution and imposing heavy sentences blur the distinction between offering service and committing a theft. (James, Real and Ideal: The Use of Legal Sanctions as Moral Agents.) (Accord, Cooney and Quint, supra par 5.) Because prostitution and patronizing a prostitute are criminally sanctioned, prostitutes and their patrons alike fear reporting ancillary crimes for fear of prosecution. Moreover, 70% of the women in prison for felonies were first arrested for prostitution. (James, Withers, Haft and Thiess, The Politics of Prostitution, supra pp xv, 25.) Thus, there is a clear inference that it is the criminalization of prostitution and not prostitution itself that leads to ancillary crime.
This court knows of no study that has substantiated the allegation that sex for money in fact causes ancillary crime. Nor has the Corporation Counsel shed any light on this subject. Due process requires that a law be reasonably related and applied to some actual or manifest evil: it must have as its objective the eradication of harm in fact caused by the proscribed conduct. (New York State Soc. of Med. Masseurs, 74 MisC 2d 573, 574 supra.) The Constitution limits the extent to which the State can proscribe prostitution with the purpose of eradicating an entirely distinct, severable kind of conduct. (See Stanley v Georgia, 394 US 557, 567 supra; Eisenstadt v Baird, 405 US 438, supra.) The State must proceed against ancillary crimes directly by enforcing the specific sanctions against such conduct and may not rely on the blunderbuss approach of incarcerating all prostitutes.
The Corporation Counsel claims that prostitution encourages the spread of organized crime. There is no factual basis for this allegation. Prostitution plays "a small and declining role in organized crime’s operation”.[24] (Report by the Presi *80 dent’s Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, 189 [1967]. Accord, Rosenbleet and Pariente, The Prostitution of the Criminal Law, supra; Sherwin and Winick, Debate: Should Prostitution be Legalized?, J. Sexual Behavior, p 72 [1972].) Although organized crime clearly presents a threat to the general security of the public, there is no proof that prostitution is the cause in fact of organized crime. Therefore, it is improper and unreasonable for the State to proscribe prostitution as a method of curbing organized crime.
. [8] Another type of harm attributed to prostitution is that it injures the community. Underlying this claim are the allegations that commercial sex undermines the stability of the family and is simply immoral.
The law may seek to legislate morality, but it must do so without offending the constitutional protections of the due process clause and the right of privacy, (cf. People v Costello, 90 MisC 2d 431.)
The Penal Law should act to deprive an individual of liberty only when a real and demonstrable harm to the public can result from the proscribed conduct. The State cannot rely upon the bare assertion of immorality to justify a criminal prohibition. (Cf. Paris Adult Theatre I v Slaton, 413 US 49 and Doe v Commonwealth's Attorney, 425 US 901 affg 403 F Supp 1199 with United States Dept. of Agriculture v Moreno, 413 US 528, 535 n 7; Wisconsin v Yoder, 406 US 205; Griswold v Connecticut, 381 US 479, supra; Stanley v Georgia, 394 US 557, supra; Eisenstadt v Baird, 405 US 438, supra; and Roe v Wade, 410 US 113, supra.) Attempts by the State to regulate lifestyle choices on the bare assertion that the regulation serves morality are impermissible. (Wisconsin v Yoder, supra; Wilkinson and White, Constitutional Protection for Personal Lifestyles, supra, p 618.) Conduct that does not interfere with the rights and interests of others may not be regulated by the State.
Preventing harm to what is believed by many to be the central institution for social co-operation, the family may well be a legitimate objective of the State. Most male patrons of prostitutes are married (Cooney and Quint, supra, par 3). And *81 it is the patron who creates the demand for the services of prostitutes. Thus, if the marital contract is breached by promiscuity or the family undermined by extramarital sexual relations, the burden of responsibility lies with the patron, not the prostitute. Yet, the Penal Law punishes the prostitute most severely. If the State’s objective is to promote the stability of the family and commercial sex has a direct impact upon the family, then the law should focus on the conduct of the patron. However, it has never been demonstrated that commercial sex has had any effect on the stability of marriage or the family. (See Caughey, The Principle of Harm, 51 Denver 235, 261 [1974]; Wilkinson and White, supra.) Indeed, although prostitution has been practiced for centuries, disruption of the family has never been causally related to prostitution. Several States and numerous foreign nations have decriminalized prostitution without any indication of a concomitant decline in the vitality of the marital or family institution. (See Vorenburg, Elizabeth and James, The Biggest Pimp of All: Prostitution and Some Facts of Life, The Atlantic Monthly, Jan. 1977, vol 239, No. 1, p 31.)[25] The decriminalization of fornication in this State has not led to any reported damage to the family. This court can find no reason why commercial fornication should have a less innocuous effect on these social institutions. Thus there is no empirical connection between prostitution, whether involving ordinary or deviate sexual intercourse, and the stability of the family. Therefore, the State cannot reasonably assert protection of marriage and the family as legitimate objectives for its regulation of prostitution.
Sex for a fee is recreational, not procreational sex. Typically, it is the female participant who receives the fee. The arguments that prostitution harms the public health, safety or welfare do not withstand constitutional scrutiny. It may be that it is the fact that a woman is accepting a fee for recreational, sexual services that triggers the governmental intrusion upon this private consensual sexual conduct. If it is paternalism that prompts the Legislature to protect women by
*82 proscribing prostitution,[26] that motive is ill served by the prostitution laws since women are not protected, but rather are penally punished. Society may find something offensive about having women perform sex for money. However offensive it may be, recreational commercial sex threatens no harm to the public health, safety or welfare and, therefore, may not be proscribed.
Finally, prostitution is said to offend public sensibilities. Individual members of the public may indeed be offended by the public conduct associated with prostitution: they may be solicited on the street by prostitutes, embarrassed by the advances of streetwalkers, or find their path on the sidewalks or thoroughfares blocked.[27] Such conduct may, indeed, be a harm legitimately of interest to the State should it constitute public disorder. This court will not decide the question of who has a right to be on the public streets. However, the court will point out that this public conduct is not caused in fact by the act of engaging in sexual relations for a fee. This harm, if any, is caused by the solicitation aspect of prostitution. The public aspect of prostitution, solicitation, must be distinguished from its private aspect, the performance of consensual sexual relations for a fee in private. Street solicitation is a method of advertising the business of commercial sex. It is separable from the underlying activity. In Nevada and Great Britain, for example, prostitution has been legalized, but street solicitation is proscribed by public order, breach of the peace — type statutes. Advertising is unoffensively and effectively accomplished through the use of discreet newspaper advertisements. (See Atlantic Monthly, supra.)
The prohibition of the offensive public conduct associated with the solicitation of prostitution may be a legitimate State objective. Since it has been demonstrated that only this, public element of prostitution may make that conduct harmful, and that public conduct may be dealt with separately from the sexual conduct itself, it would be unreasonable for the State to completely proscribe private, sexual conduct in order to reach *83 distinct public solicitation. Members of the public may have a protectible privacy interest: not to be repeatedly accosted on the streets by a prostitute any more than a religious zealot, peddler, alcoholic or panhandler, and not to have a group of street musicians, noisy teenagers, solicitors for charities, or streetwalkers converging at his or her doorstep. These public interests can be protected, but by less intrusive means than those now employed by the State. Private, consensual sexual conduct between adults, whether or not performed for a fee, is protected by the right of privacy. If the State has a legitimate interest in curbing public disorder, it can and must accomplish this objective without depriving the individual of his or her right to engage in private, consensual, sexual relations. The constitutionally protected right of privacy makes it incumbent upon the State to implement its policy by more reasonable, less intrusive means.
For the reasons stated, the sexual conduct charge against respondent is dismissed.

. Respondent is also charged with robbery in the second degree (Penal Law, § 160.10) and assault in the second degree (Penal Law, § 120.05) in that she together with three others forcibly stole $30 from the complaining witness.

. Patronizing a prostitute is a violation.

. The complaining witness could have been charged with attempted statutory rape (Penal Law, art 110; § 130.25, subd 2) or endangering the welfare of a minor (Penal Law, § 260.10), in addition to patronizing a prostitute.

. See e.g., Matter of Lane, 58 Cal 2d 99; United States v Moses, 41 USLW 2298 (DC Super Ct 1972) revd 339 A 2d 46; memorandum for plaintiffs at 3-16, Divoky v San Francisco Police Dept., No. 678-023 (Cal Super Ct 1973).

. In opposing respondent’s motion to dismiss the charges relating to prostitution on constitutional grounds, the Corporation Counsel argues that since this court is a court of original jurisdiction with limited power, it should not determine constitutional issues, citing many cases in support of that position. These decisions indicate, however, that there are exceptions to that rule in "rare cases” where life or liberty is involved and the invalidity of the statute is apparent. (People v Mollette, 87 Misc 2d 236.) This court has no difficulty concluding that the enforcement of the statutes in question against the respondent presents a rare and exceptional case involving her liberty and fundamental rights. And as a threshold matter, respondent has demonstrated that these statutes dealing with the private sexual conduct of consenting adults may be found constitutionally infirm in that these statutes appear to conflict with the guarantees of equal protection, due process of law and privacy contained in the Constitution of the State of New York.
This court agrees with those cases holding that the wisdom of a particular statute is beyond the scope of judicial review and that a court should not substitute its judgment for that of the Legislature. But a Legislature, no matter how laudable its objectives, may not enact legislation which conflicts with constitutional rights. Since respondent has made an initial showing that the statutes in question deprive persons of their liberty by subjecting such persons to the possibility of imprisonment and/or fines merely for exercising their fundamental right to engage in or agree to engage in consensual sexual conduct in private, this court will proceed to determine the constitutional issues raised.

. This pattern of sex-discriminatory enforcement of prostitution laws is found nationwide. See FBI Uniform Crime Reports (1973); American Friends Service Committee, Seattle Office, Ladies Day; Discretion in Municipal Court, Department One (unpub mono, 1974); United States v Moses, 41 USLW 2298 (DC Super Ct, Nov. 3, 1972) 339 A 2d 46; defendant’s memorandum, Commonwealth v Reddick, revd Mass Super Ct No. 70518-9 (1973).

. Affidavit of Debra Samuels, student intern at the Legal Aid Society Juvenile Rights Division, July 29, 1977. The Corporation Counsel does not dispute these facts. Letter from Sydney A. Mayers, Assistant Corporation Counsel, to the court (Aug. 2, 1977).

. Id. See also, affidavit of Charles Gilley, investigator employed by the Legal Aid Society Juvenile Rights Division, which indicates that 6,063 arrests for prostitution were made in New York City in 1976 whereas section 230.05, Patronizing a prostitute, was only enforced against 507 persons. Only 150 of those patrons were arrested, the majority were merely served with summonses. The vast majority of prostitution arrests were of females and all the patrons charged were males. (Gilley affidavit, supra; see NY Times, Nov. 16, 1977, p D17, col 5, which reports that the city’s police force currently makes no attempt to arrest patrons.)

. In experimental programs in New York City and the District of Columbia female undercover police officers were assigned to pose as prostitutes to entrap patrons. White, married, middle class and middle aged men were arrested. The public uproar of "respectable” citizens that ensued in response to these arrests caused the end of these experiments. (See NY Times, Nov. 16, 1977, p D17, col 5; brief for appellees, p 45, United States v Moses, DC Ct of App No. 7042; James, Withers, Haft and Theiss, The Politics of Prostitution, pp 28-29 [1975]). This commonplace selective enforcement tactic designed to punish the female streetwalker and leave unscathed her white, middle aged, middle class married male client (Politics of Prostitution, supra, pp 52-53; Cooney and Quint, Prostitution in New York City: Answers to Some Questions, par 3 [June, 1977]) is a very costly law enforcement practice. It violates the streetwalker’s right to equal protection of the law. Moreover, community support for law enforcement is eroded when the streetwalker is repeatedly arrested while patrons, pimps, hotel owners and landlords go free. The court acknowledges the community concern over the street activity connected with prostitution. But inasmuch as it is the patron who is most sensitive to arrest and who is most likely to be deterred from engaging in allegedly disruptive public conduct, nondiscriminatory enforcement of the prostitution laws against all participants — patrons, landlords, pimps, hotel owners and prostitutes alike — could resolve the constitutional infirmity and have a significant impact upon the street problems associated with prostitution.

. Unofficial sources report that the vast number of prostitutes arrested under section 230.00 of the Penal Law (and related statutes) are non-white streetwalkers. Cooney & Quint, Prostitution in New York City: Answers to Some Questions, p 2 (1977). Their customers are predominantly white males. Id. See James, A Formal Analysis of Prostitution in Seattle — Final Report, U of Washington (1971); Benjamin & Masters, Prostitution & Morality, p 104 (1964). Thus, it appears that section 230.00 of the Penal Law works an invidious racial discrimination.

. To borrow a succinctly worded observation from the Court of Appeals: ”[T]he conclusion seems inescapable that lurking behind the discrimination is the imputation that females who engage in misconduct, sexual or otherwise, ought more to be censured, and their conduct subject to greater control and regulation, than males. Somewhat similar moral presumptions have been squarely rejected as a basis or excuse for sexually discriminatory legislation”. (Matter of Patricia A., 31 NY2d 83, 88-89.)
Numerous commentators share the Court of Appeals’ perspective that underlying the extremely harsh treatment meted out to females engaging in sexual "mis”conduct or commercial sex are archaic notions that a woman’s place is in the narrowly circumscribed, nonpublic world. When females wander out of this protective sphere into the public, they "get what they deserve”. Or to state the same idea more pointedly, that females are chattel, the property of one male, and therefore, have no right to be promiscuous, to self-determine to whom and when they shall bestow their "sexual favors”. See e.g., Wilkinson and White, Constitutional Protection for Personal Lifestyles, 62 Cornell 563 (1976-1977); Rosenbleet and Pariente, The Prostitution of the Criminal Law, 11 Am Grim L Rev 373, 387, n 84 (1973).

. See introductory memorandum of Albert H. Blumenthal, accompanying the submission of section 240.37 of the Penal Law to the State Assembly: "Law abiding citizens in our cities have been increasingly subjected to harassment, interference and embarrassment by persons engaged in and promoting prostitute activities. Moreover, vehicular traffic in our congested cities is often disrupted by persons engaged in this illicit activity. The public demands and should have protection from invasion of its privacy.”

. The complaining witness was not charged with a violation of section 230.05 of the Penal Law nor any other violation of the law despite the fact that he agreed to pay a 14-year-old girl $10 if she would engage in a "deviate” sexual act with him.

. The New York State Human Rights Law forbids discrimination on the basis of marital status. (Executive Law, § 296, subd 1, par [a].) Thus, the State has clearly expressed its displeasure at distinctions based on marital status.

. In late 1973, the board of trustees of the American Psychiatric Association (A.P.A.) decided to remove homosexuality from the list of mental diseases. (NY Times, Dec. 16, 1973, p 1, col 1.) This action met with the approval of the A.P.A. membership in 1974. (NY Times, April 9, 1974, p 12, col 4.) Studies indicate that most unmarried persons engage in the sexual conduct characterized as deviate sexual intercourse. Of unmarried heterosexual persons between the ages of 18 and 24 years old 72% of those studied performed fellatio, 69% performed cunnilingus. One sixth of all persons under 25 years of age who have ever had coitus have engaged in anal intercourse. (Hunt, Sexual Behavior in the 1970’s, pp 166-167.) Studies also reveal that 20 to 25% of all males over the age of 15 have engaged in oral or anal sex with another male and 10-20% of all females over 19 years of age have engaged in oral sex with another female. (Hunt, supra, p 312; Kinsey, Sex and the Human Male; Kinsey, Sex and the Human Female.)

. Hunt, supra.

. Policy Statement of New York Secretary of State Mario Cuomo (June 25, 1976). "[T]he Department of State does not believe that affectional or sexual preference is a relevant factor in determining the grant, maintenance or renewal of licenses. Nor does the Department believe that convictions arising from the actions of consenting adults engaged in or seeking nonpecuniary sexual activity should be considered in determining the good character of our licensees. The Department, however, will consider such convictions when they result from sexual activity with a mentally defective, mentally incapacitated or physically helpless person.”

. Matter of Labady, 326 F Supp 924, supra.

. Matter of Kimball, 33 NY2d 586.

. Seventeen States have repealed their consensual sodomy laws: Arkansas, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Indiana, Maine, New Hampshire, New Mexico, North Dakota, Ohio, Oregon, South Dakota, Washington. Comment, The Constitutionality of Sodomy Statutes, 45 Fordham L Rev 553, 592 (1976).

. It should be stated at the outset that this court does not find Doe v Commonwealth’s Attorney (425 US 901, affg without opn 403 F Supp 1199) dispositive of any of the issues here. In Doe, a divided three-Judge Federal court declared that the Virginia consensual sodomy law did not violate petitioner’s right to privacy under the Federal Constitution. The affirmance of this decision by the Supreme Court without opinion has minimal precedential value. It means that the court approves of the result as to these parties on the facts presented but does not indicate approval of the lower court’s reasoning. (Edelman v Jordan, 415 US 651, 671; Fusari v Steinberg, 419 US 379, 391 [Burger, Ch. J., concurring].) Moreover, Doe rested on Federal constitutional grounds whereas this court weighs the constitutionality of sections 230.00 and 130.38 of the Penal Law on State constitutional grounds. It is clear that a State may afford greater protection to its citizens than is provided under the Federal Constitution. (See e.g., Alevy v Downstate Med. Center, 39 NY2d 326, supra; Matter of Ogilvie, 83 Misc 2d 896, supra; Address by Justice Brennan, NJ State Bar Assn meeting [May 22, 1976].)

. 84% of the reported cases of venereal disease occurred in persons between the ages of 15 and 30. Yet, 70% of the persons who patronize prostitutes are between the ages of 30 and 60. (James & Burnstin, Prostitution in Seattle, Washington State Bar News, p 8 [Aug. — Sept., 1971].)

. The cost to New York taxpayers of arresting and obtaining court disposition of a prostitute has been estimated at $1,705. Additionally, it costs the public $1,250 to incarcerate a prostitute for 30 days. (See Demitz, Research Project on Victimless Crime: Prostitution [prepared for the Citizens Union of the City of New York, May, 1977] for a cost-benefit analysis of New York’s criminalization of commercial sex.) Over 3,200 persons have been arrested and arraigned under section 230.00 of the Penal Law [only one of several prostitution related ofienses] during the months of January through June, 1977 in New York County alone. (See Affidavit of Debra Samuels.) As pointed out in footnote 22 above, 70% of the persons patronizing prostitutes are 30-60 years old yet it is the 15 to 30-year-old age group that has the highest incidence (84%) of V.D. (James and Burnstin, Prostitution in Seattle, Washington State Bar News, p 8 [Aug. — Sept., 1971].) Thus, there is no rational relationship between the objective of protecting public health and the criminalization of prostitution as a method of obtaining that objective.

. Prostitution is claimed to be too diffuse a business to be successfully controlled by organized crime. By contrast, the massage parlor business is far more likely to be controlled by organized crime. (Cooney and Quint, Prostitution in New York City: *80 Answers to Some Questions, p 8; Caughey The Principle of Harm, 51 Denver 235, 261 [1974].)

. In Amsterdam, the "red light” district is situated very near the governmental centers and wealthy residential neighborhoods. Psychologists who studied children who grew up in and frequented the district found no ill effects of the exposure of the children to prostitutes or commercial sex. (Vorenberg, Elizabeth and James, The Biggest Pimp of All: Prostitution and Some Facts of Life, The Atlantic Monthly, vol 239, No. 1, Jan. 1977, p 31.) In Amsterdam, it should be noted that the prostitutes are not permitted to roam the street, soliciting customers.

. Paternalism certainly could not be the motive in the instant case. Respondent is a 14-year-old female. If the motive of this proceeding were to protect her, she would not be threatened with the loss of her liberty. Paternalism might dictate an article 10 of the Family Court Act proceeding on her behalf. It clearly would dictate some charge against the patron, such as endangering the welfare of a minor, attempted statutory rape or criminal solicitation. None of these protective measures were taken in this case.

. See Blumenthal memorandum, supra, n 10.