57 N.Y.2d 27 (1982)
Board of Education, Levittown Union Free School District et al., Respondents-Appellants, and Board of Education, City School District, Rochester et al., Intervenors-Respondents-Appellants,
v.
Ewald B. Nyquist, as Commissioner of Education, et al., Appellants-Respondents.
Court of Appeals of the State of New York.
Argued May 10, 1982.
Decided June 23, 1982.
Robert Abrams, Attorney-General (Amy Juviler, Shirley Adelson Siegel, Clement H. Berne and Evelyn Tenenbaum of counsel), for appellants-respondents.
Daniel P. Levitt, Edward H. Rosenthal and Miriam R. Best for respondents-appellants.
John Silard and Adam Kaufman for Rochester Board of Education; Frederick A. O. Schwarz, Jr., New York City Corporation Counsel (Doron Gopstein of counsel); David M. Garber, Syracuse Corporation Counsel, and Joseph P. McNamara, Buffalo Corporation Counsel, for intervenors-respondents-appellants.
Peter M. Fishbein, Michael D. Blechman, Daniel D. Chazin and Michael Starr for 85 public school districts, amici curiae.
Joseph T. McLaughlin, William M. Kelly, Dennis P. Orr and Daniel Levin for the Public Education Association and others, amici curiae.
Jack Greenberg, Steven L. Winter and Nancy A. Kilson for the NAACP Legal Defense and Educational Fund, Inc.; Jeffry H. Gallet for the New York Metropolitan Council of the American Jewish Congress, and Kevin Kearney for the Department of Education, Diocese of Brooklyn, amici curiae.
John F. Haggerty and Michael R. Lanzarone for Warren M. Anderson, amicus curiae.
Chief Judge COOKE and Judges JASEN, GABRIELLI, WACHTLER and MEYER concur with Judge JONES; Judge FUCHSBERG dissents and votes to affirm in a separate opinion.
*35 JONES, J.
The present amalgam of statutory prescriptions for State aid to local school districts for the maintenance and support of public elementary and secondary education does not violate the equal protection clause of either the Federal or the State Constitution nor is it unconstitutional under the education article of our State Constitution.
This declaratory judgment action challenging the State's provisions for financing our public schools is prosecuted by two groups, representing different constituencies and mounting attacks based on different predicates. The original plaintiffs by which the action was instituted in 1974 are the boards of education of 27 school districts located at various sites in the State and 12 students of public schools located in some of those districts. The intervenors, whose participation in the action was agreed to by the original parties, are the boards of education, officials, resident taxpayers, and students of the Cities of New York, Buffalo, Rochester and Syracuse, together with a federation of parent and parent-teacher associations in the City of New York. Defendants are the Commissioner of Education, the University of the State of New York, the State Comptroller and the Commissioner of Taxation and Finance of the State of New York.[1]
It is the contention of the original plaintiffs (who are "property-poor" school districts) that the system for financing public schools presently in effect in this State (as principally set forth in Education Law, § 2022 [provision for local district financing]; and § 3602 [apportionment of State aid]) by which funds raised by locally imposed taxes are augmented by allocations of State moneys in accordance with a variety of formulas and grants, violates the equal protection clauses of both the State and the Federal Constitutions and the education article of our State Constitution *36 because that system results in grossly disparate financial support (and thus grossly disparate educational opportunities) in the school districts of the State. The intervenors, representing interests in school districts located in four of the largest cities in the State, also assert violations of the same State and Federal constitutional provisions as the result of circumstances said to be peculiar to cities which they contend place them in a position comparable to that of property-poor districts. Included in these circumstances, they assert, are special financial burdens borne by cities in four categories: (1) demands on municipal budgets (from which local funds for education are secured) for noneducation needs peculiar to cities ("municipal overburden"), (2) diminished purchasing power of the municipal education dollar, (3) significantly greater student absenteeism (with a resulting adverse effect both because of added operational costs and because State aid is largely allocated on the basis of average daily attendance), and (4) larger concentrations in cities of pupils with special educational needs, all four of which may be comprehended within the term "metropolitan overburden". These factors are said to result in greatly disparate educational opportunities available to children in the cities' public schools when compared to the offerings of some of the school districts not located within cities.
Succinctly stated, it is the gravamen of the complaint of the original plaintiffs (and the findings of the courts below provide factual support for their argument) that property-rich districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the property-poor districts. The intervenors argue that although they are not disadvantaged in their ability to raise gross revenue from local sources, in consequence of the economic factors of metropolitan overburden the net effective economic ability of the city districts falls well below that of noncity districts (and the factual determinations made below support their argument). Both then assert that State aid as presently granted serves to perpetuate, and even to exacerbate, these disparities.
*37 Both courts through which this litigation has progressed have granted declarations favorable to the original plaintiffs and to the intervenors, although not on all the claims asserted. Each court made careful and detailed factual determinations with respect to the financing of the State's educational system, the operation of the various State aid statutory provisions, and their practical impact on various school districts, individually and comparatively. In the case of the Appellate Division there was consideration not only of the public school finance system as it existed at the time the action was commenced in 1974 but also of the effect of alterations accomplished by legislation up to and through chapters 53 and 148 of the Laws of 1981. In reaching our disposition we proceed on these factual determinations made by both courts below as to the details of the various school district programs and operations and their comparison with one another, as well as the impact on them of the present State aid programs.
After an extended nonjury trial which produced 23,000 pages of transcript and 400 exhibits, the Justice presiding issued a judgment declaring that the State's public school finance system violates both the equal protection clause (art I, § 11) and the education article (art XI, § 1) of the State Constitution and, as to the cities whose interests are represented by the intervenors, the equal protection clause (14th Amdt, § 1) of the Federal Constitution as well. The Appellate Division, by a divided court, modified the judgment of the trial court; while concurring in the determination that the provisions of the State Constitution had been violated, the appellate court rejected the conclusion that the intervenors had also established a violation of the Federal Constitution. Justice HOPKINS, concurring in part and dissenting in part, rejected all claims of denial of equal protection, but concluded that the present "maze of convoluted intricacies and provisos" of State aid fails to constitute a "basic State-wide fiscal system for education" as required in his view by the education article of the State Constitution (83 AD2d 217, 267-268). We now modify the order of the Appellate Division and direct that judgment be entered declaring that the present admixture of statutory provisions for State aid to local school districts, considered *38 in connection with the existing system for local financing, is constitutional under the equal protection clause of the Federal Constitution and under both the equal protection clause and the education article of the State Constitution.
At the outset it is appropriate to comment briefly on the context in which the legal issues before us arise. Although New York State has long been acknowledged to be a leader in its provision of public elementary and secondary educational facilities and services, and notwithstanding that its per pupil expenditures for such purposes each year are very nearly the highest in the Nation,[2] it must be recognized that there are nonetheless significant inequalities in the availability of financial support for local school districts, ranging from minor discrepancies to major differences, resulting in significant unevenness in the educational opportunities offered.[3] These disparities may properly be ascribed in some respects to the wide variances between the property assessment bases on which local district taxes are imposed. Similarly, it may be accepted that the four major cities represented by the intervenors, by reason of the factors encompassed in metropolitan overburden, are forced to provide instructional services and facilities of a lesser quantity, variety, and quality than those provided in some other school districts. No claim is advanced in this case, however, by either the original plaintiffs or the intervenors that the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.
The determination of the amounts, sources, and objectives of expenditures of public moneys for educational purposes, especially at the State level, presents issues of enormous practical and political complexity, and resolution *39 appropriately is largely left to the interplay of the interests and forces directly involved and indirectly affected, in the arenas of legislative and executive activity. This is of the very essence of our governmental and political polity. It would normally be inappropriate, therefore, for the courts to intrude upon such decision-making (see Matter of Board of Educ. v City of New York, 41 N.Y.2d 535, 538; Matter of Anderson v Krupsak, 40 N.Y.2d 397, 402-403; New York Public Interest Research Group v Steingut, 40 N.Y.2d 250, 257; cf. James v Board of Educ., 42 N.Y.2d 357). With full recognition and respect, however, for the distribution of powers in educational matters among the legislative, executive and judicial branches, it is nevertheless the responsibility of the courts to adjudicate contentions that actions taken by the Legislature and the executive fail to conform to the mandates of the Constitutions which constrain the activities of all three branches. That because of limited capabilities and competences the courts might encounter great difficulty in fashioning and then enforcing particularized remedies appropriate to repair unconstitutional action on the part of the Legislature or the executive is neither to be ignored on the one hand nor on the other to dictate judicial abstention in every case. In the discharge of our judicial responsibility in this case, recognizing the existence of the very real disparities of financial support as found by the lower courts, we nonetheless conclude that such disparities do not establish that there has been a violation of either Federal or State Constitution.[4]
*40 Considering first the claim that the existing provisions for State aid to finance public education in this State violate the equal protection clause contained in the Fourteenth Amendment of the United States Constitution, we agree with the Appellate Division that this claim must fail. The equal protection argument as developed by the original plaintiffs is that, because what are termed property-rich districts (those districts having a greater amount of assessable real property per pupil) are able to generate, through local taxation approved by taxpayers in those districts, a larger amount of money per pupil for education than is generated through the same process of local tax approval by property-poor districts (resulting in a lower per pupil expenditure in the latter districts), the financial resources (and thus education programs and facilities) of the two groups are significantly unequal. The intervenors assert that, in the case of large cities, although the property wealth per pupil is not low, inequality is nevertheless occasioned by metropolitan overburden which likewise operates to diminish the available financial resources (and thus per pupil expenditures) in those localities. The inequalities existing in property-poor and large city school districts, both argue, are perpetuated and magnified rather than remedied by the existing distribution of State funds allocated to education  apportioned as such funds are in accordance with a formula and variations thereof which supplement local school tax revenue only to the extent of assuring a minimum, uniform per pupil expenditure throughout the State, together with an additional flat grant for each pupil and "save harmless" or special aid provisions which are designed to compensate for inflationary increases in real property values and to ease the effect of decreasing pupil population.
The essence of the original plaintiffs' argument  that disparities in per pupil expenditures, resulting largely from differences in the value of assessable property per *41 pupil among school districts, coupled with a failure by the State to offset such disparities by provision of compensating aid funds, constitute an impermissible discrimination against pupils in the less property-wealthy districts in violation of the Fourteenth Amendment  was considered and rejected by the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1). Noting that the subject of public school finance involves decisions both with respect to the raising and disposition of public revenues and of persistent, complex, and difficult questions of educational policy areas appropriately within legislative determination  the court held that rational basis, rather than strict scrutiny, was the proper standard against which to examine the Texas public school financing system there under review (which was described by the court as "comparable to the systems employed in virtually every other State" [at pp 47-48]). Applying this standard, the court found in the Texas system a rational relationship to a legitimate State purpose  the permission and encouragement of participation in and control of public schools at the local district level (at p 49). As both courts below acknowledged, the conclusions reached in that case dictate a similar result in the present litigation insofar as the original plaintiffs' claim of a Federal Constitution violation is concerned.
With respect to the intervenors' position in this litigation, not in haec verba put before or considerd by the Supreme Court in San Antonio, that metropolitan overburden is an unequalizing force which must be remedied by compensating increases in State aid to city school districts, a response is found in the opinion by Justice HOPKINS at the Appellate Division, which observes that the cited inequalities existing in cities are the product of demographic, economic, and political factors intrinsic to the cities themselves, and cannot be attributed to legislative action or inaction. While unquestionably education faces competition in the contest for municipal dollars from other forms of public service for which nonmunicipal school districts bear no responsibility, municipal dollars flow into the cities' treasuries from sources other than simply real property taxes  sources similarly not available to nonmunicipal *42 school districts. The disbursement of the funds received from real estate taxes and such other sources and the decisions as to how they shall be allocated are decisions to be made by municipal governmental bodies. In the words of Justice HOPKINS: "It is beyond the power of this court in this litigation to determine whether the appropriations of the intervenor-plaintiffs have been wisely directed or reasonably applied, or whether their budgets are fairly divided in terms of priority of need between the competing services, such as police, fire, health, housing and transportation, and it is, equally, beyond the power of the court to determine whether the resources of the intervenor-plaintiffs can otherwise be employed so that their educational needs can be met." (83 AD2d 217, 262.) Accordingly, we conclude that, applying the rational basis test, the intervenors have failed to demonstrate denial of equal protection under the Federal Constitution.
We turn then to the claims of both original plaintiffs and intervenors that, whatever may be determined with respect to the equal protection clause of the Federal Constitution, a violation of the comparable provision of our State Constitution (art I, § 11) has been demonstrated  the conclusion reached by both courts below. Our attention must first be directed to identification of the standard appropriate to the subject now before us (financial support for public education) for examination as to whether there has been a violation of our constitutional mandate of equal protection (Montgomery v Daniels, 38 N.Y.2d 41, 59). The Appellate Division, declining to apply the measurement of strict scrutiny that had been employed by the trial court and under which the trial court had found the education finance system invalid, concluded that the intermediate or more careful scrutiny test described in Alevy v Downstate Med. Center of State of N. Y. (39 N.Y.2d 326) was properly to be employed  justifying this decision by its conclusion that the right to education in this State "represents an important constitutional interest". (83 AD2d, at p 241.) The choice of that intermediate standard, under which the appellate court also found the system invalid, cannot be *43 sustained however, both for the previously recited reasons articulated in the San Antonio case and in face of our decision in Matter of Levy (38 N.Y.2d 653, app dsmd sub nom. Levy v City of New York, 429 US 805, reh den 429 US 966). In Levy we expressly held that rational basis was the proper standard for review when the challenged State action implicated the right to free, public education. Nothing in the present litigation impels a departure from that decision, made as it was with full recognition of the existence in our State Constitution of the education article (art XI).
The circumstance that public education is unquestionably high on the list of priorities of governmental concern and responsibility, involving the expenditures of enormous sums of State and local revenue, enlisting the most active attention of our citizenry and of our Legislature, and manifested by express articulation in our State Constitution, does not automatically entitle it to classification as a "fundamental constitutional right" triggering a higher standard of judicial review for purposes of equal protection analysis. Thus, in Matter of Bernstein v Toia (43 N.Y.2d 437), where the concern was public assistance to the needy  clearly a matter of significant interest, provision for which is similarly included in our State Constitution[5] (art XVII, § 1)  we employed the rational basis test as the proper standard for review. The more careful scrutiny standard has been applied when the challenged State action has resulted in intentional discrimination against a *44 class of persons grouped together by reason of personal characteristics, the use of which called into question the propriety of the particular classifications (People v Whidden, 51 N.Y.2d 457 [gender]; Matter of Fay, 44 N.Y.2d 137, app dsmd sub nom. Buck v Hunter, 439 US 1059 [illegitimacy]; Matter of Lalli, 43 N.Y.2d 65, affd sub nom. Lalli v Lalli, 439 US 259 [illegitimacy]). The Alevy case itself was one in which race was the factor which pervaded the reverse discrimination alleged by the petitioner.
No classification of persons is present in the case now before us, in which the claimed unequal treatment is among school districts resulting from disparity as to revenue available for educational purposes in consequence of unequal tax bases or unequal demands on local revenue. The claim is of discrimination between property-poor and property-wealthy school districts. No authority is cited to us, however, that discrimination between units of local government calls for other than rational basis scrutiny.
Our inquiry is therefore only whether there has been demonstrated the absence of a rational basis for the present school financing system, premised as it is on local taxation within individual school districts with supplemental State aid allocated in accordance with legislatively approved formulas and plans. Addressing the submissions of the original plaintiffs, our conclusion is that there has not been such a showing, and that the justification offered by the State  the preservation and promotion of local control of education  is both a legitimate State interest and one to which the present financing system is reasonably related.
Under the existing system the State is divided into more than 700 local school districts, each of which varies from the others and, from time to time, varies within itself, in greater or lesser degree, as to number of pupils and value of assessable real property, as well as with respect to numerous other characteristics, including personal wealth of its taxpayers. Outside the cities in the State (in which school funding is a part of the total municipal fiscal process), funds for the support of the education program offered in the schools of a district are raised through the imposition of local taxes following voter authorization *45 based on approval of a budget prepared and submitted by an elected board of education, reflecting the instructional program (within standards fixed by the State) perceived by the local board of education to be responsive to the needs and desires of the community. By way of assuring that a basic education will be provided and that a uniform, minimum expenditure per pupil will occur in each district, the Legislature has long provided for payment of supplementing State aid such that presently $1,885 per pupil (and, by a weighting computation, larger amounts for particular types of pupils) is available for education in each district. Throughout the State, voters, by their action on school budgets, exercise a substantial control over the educational opportunities made available in their districts; to the extent that an authorized budget requires expenditures in excess of State aid, which will be funded by local taxes, there is a direct correlation between the system of local school financing and implementation of the desires of the taxpayer.
It is the willingness of the taxpayers of many districts to pay for and to provide enriched educational services and facilities beyond what the basic per pupil expenditure figures will permit that creates differentials in services and facilities. Justification for a system which allows for such willingness was recognized by the Supreme Court of the United States in San Antonio School Dist. v Rodriguez (411 US 1, 48, n 102, supra) quoting with approval a statement which accompanied the State of Hawaii's 1968 amendment of its educational finance statute to permit counties to collect funds locally and spend them on their schools over and above the wholly State-funded program: "Under existing law, counties are precluded from doing anything in this area, even to spend their own funds if they desire. This corrective legislation is urgently needed in order to allow counties to go above and beyond the State's standards and provide educational facilities as good as the people of the counties want and are willing to pay for. Allowing local communities to go above and beyond established minimums to provide for their people encourages the best features of democratic government." (Hawaii Sess Laws, 1968, act 38, § 1.) Any legislative attempt to make *46 uniform and undeviating the educational opportunities offered by the several hundred local school districts  whether by providing that revenue for local education shall come exclusively from State sources to be distributed on a uniform per pupil basis, by prohibiting expenditure by local districts of any sums in excess of a legislatively fixed per pupil expenditure, or by requiring every district to match the per pupil expenditure of the highest spending district by means of local taxation or by means of State aid (surely an economically unrealistic hypothesis)  would inevitably work the demise of the local control of education available to students in individual districts. The amicus brief filed on behalf of the 85 school districts puts it well: "For all of the nearly two centuries that New York has had public schools, it has utilized a statutory system whereby citizens at the local level, acting as part of school district units containing people with a community of interest and a tradition of acting together to govern themselves, have made the basic decisions on funding and operating their own schools. Through the years, the people of this State have remained true to the concept that the maximum support of the public schools and the most informed, intelligent and responsive decision-making as to the financing and operation of those schools is generated by giving citizens direct and meaningful control over the schools that their children attend."
The State-wide $360-per-pupil flat grant provided by State aid legislation is immune from attack under the equal protection clause, for on its face there is no inequality in this per pupil distribution of State aid which is allocated to all school districts without differentiation. Nor does the fact that the "save harmless" or special aid grants accrue to the benefit of only those districts which stand to suffer identified harm by reason of changing property values or of diminishing pupil registration serve to invalidate the school financing system. In addition to the fact that only a minimal amount of State aid is distributed under this category, we cannot say that there is no rational basis for the Legislature's selection of districts subject to these impacts as those for whom alleviating relief is appropriate and for its provision for such relief so long as the *47 relief is uniformly available to school districts falling within the classifications.
As to the intervenors, their contentions that they are denied equal protection under the State Constitution must be rejected for the same reasons that their comparable claims under the Federal Constitution are rejected (supra, at pp 41-42).
Finally, we consider the claim, upheld by all the Judges below, that the present school financing system violates the education article (art XI, § 1) of our State Constitution. It is there required that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."
It is significant that this constitutional language  adopted in 1894 at a time when there were more than 11,000 local school districts in the State, with varying amounts of property wealth offering disparate educational opportunities  makes no reference to any requirement that the education to be made available be equal or substantially equivalent in every district. Nor is there any provision either that districts choosing to provide opportunities beyond those that other districts might elect or be able to offer be foreclosed from doing so, or that local control of education, to the extent that a more extensive program were locally desired and provided, be abolished. What appears to have been contemplated when the education article was adopted at the 1894 Constitutional Convention was a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State. Nothing in the contemporaneous documentary evidence compels the conclusion that what was intended was a system assuring that all educational facilities and services would be equal throughout the State.[6] The enactment *48 mandated only that the Legislature provide for maintenance and support of a system of free schools in order that an education might be available to all the State's children.[7] There is, of course, a system of free schools in the State of New York. The Legislature has made prescriptions (or in some instances provided means by which prescriptions may be made) with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.
Interpreting the term education, as we do, to connote a sound basic education, we have no difficulty in determining that the constitutional requirement is being met in this State, in which it is said without contradiction that the average per pupil expenditure exceeds that in all other States but two. There can be no dispute that New York has long been regarded as a leader in free public education. Because decisions as to how public funds will be allocated among the several services for which by constitutional imperative the Legislature is required to make provision are matters peculiarly appropriate for formulation by the legislative body (reflective of and responsive as it is to the public will), we would be reluctant to override those decisions by mandating an even higher priority for education in the absence, possibly, of gross and glaring inadequacy  *49 something not shown to exist in consequence of the present school financing system.[8]
For the reasons stated,[9] the order of the Appellate Division should be modified, without costs, to direct that the judgment of Supreme Court be modified by substituting for *50 the declarations that the State's school financing system violates the equal protection clause and the education article of the State Constitution a declaration that the present statutory provisions for allocation of State aid to local school districts for the maintenance and support of elementary and secondary public education are not violative of either Federal or State Constitution.
FUCHSBERG, J. (dissenting).
I believe the sad record of this case demonstrates that in material manner the public school system of New York State, to which falls responsibility for the education of well over three million children, does not rise to the level dictated by a realistic reading of the State constitutional mandate for the "maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1 [emphasis added]).
Justice L. KINGSLEY SMITH of the State Supreme Court, after presiding over the 122-day trial at which this matter was exhaustively explored, found that it failed to do so (94 Misc 2d 466). Justice LEON D. LAZER, writing on this point in a painstaking and penetrating opinion for the Appellate Division, came to the same conclusion (83 AD2d 217, 219). Concurring in this view, Justices JAMES D. HOPKINS and MOSES M. WEINSTEIN each emphasized his position by writing separately to this effect. Nor did the recent Report and Recommendations of the distinguished official New York State Special Task Force on Equity and Excellence in Education, whose independent inquiry was precipitated by the findings in this case, arrive at a different appraisal. And Governor Hugh L. Carey's Elementary and Secondary School Message, delivered to the current session of the Legislature on February 17, 1982, was in the same vein.
In this connection, it is worthy of special note, in a world where life and law must not live in separate compartments, that the Governor, responding to the decrees of the afore-mentioned courts, and quoting the Task Force's statement that "in the education of children, the demands of morality are as compelling as the commands of legality", recommended a five-year program to "make equal education opportunity a reality".
*51 But the majority of this court, though compelled to accept the now affirmed "careful and detailed factual determinations * * * made by both courts below", insists that "the constitutional requirement is being met in this State". Doing so, it also rejects the lower courts' conclusion that the disparities and discriminations produced by our property-oriented educational finance system offends the equal protection guaranteed by our State Constitution (art I, § 11).[1] For the reasons which follow, my disagreement is on all counts.
At the very outset of my analysis, I put at issue the majority's assertion (majority opn, at p 43, n 5) that the inclusion of the education article in our State Constitution, far from carrying the weight of a like insertion in the Federal Constitution, where it has no counterpart, may have little more significance than would a mere "statutory articulation". I would think that a far more likely theory, consistent with our Federal form of Government, is that primary concern for education was to be that of the States rather than of the Union and that the article's placement in the State Constitution was all the more crucial in the context of the pluralistic political process of which the Tenth Amendment speaks (US Const, 10th Amdt).
In any meaningful ordering of priorities, it is in the impact education makes on the minds, characters and capabilities of our young citizens that we must find the answer to many seemingly insoluble societal problems. In the long run, nothing may be more important  and therefore more fundamental  to the future of our country. Can it be gainsaid that, without education there is no exit from the ghetto, no solution to unemployment, no cutting down on crime, no dissipation of intergroup tension, no mastery of the age of the computer? Horace Mann put it pragmatically that education is not only "the great equalizer of men", but, by alleviating poverty and its societal costs, more than pays for itself. So, too, only this past week, the Supreme Court of the United States reminded us that *52 it had recognized the public school "as the primary vehicle for transmitting the values on which our society rests" (Plyler v Doe, 457 US 202).
Even more pointed is how the sponsors of the education article perceived it. The spokesman for the unanimous Education Committee of the Constitutional Convention which immediately preceded the one at which the article was adopted, reported it in these words: "If there is any thing that should be constitutionalized because of its great importance, it is the all-important, overriding interest of education. Sir, I regard it as being paramount to every other interest in this State. I regard this article as being more important to the people of the State, to every man, woman and child in the State, than any other article that has been under consideration in this Convention" (1867-1868 NY Constitutional Convention, 4 Proceedings & Debates, p 2856).[2]
Though an unrelated political controversy foreclosed any amendment of the State Constitution that year, when it next was amended, in 1894, the article as we know it today was adopted on a report which apparently had not retreated a bit from the position that "[t]here seems to be no principle upon which the people of this commonwealth are so united and agreed as this, that the first great duty of the State is to protect and foster its educational interests" (1894 NY Constitutional Convention, Doc No. 62, p 3). The report went on to note (at p 4), "that within the last half century of constitutional revision no other State of the Union has considered it superfluous or unwise to make such an affirmation in its fundamental law" and that the article "requires not simply schools, but a system; not merely that they shall be common, but free, and not only that they shall be numerous, but that they shall be sufficient in number, so that all the children of the State may, unless otherwise provided for, receive in them their education. No desire to confine the new Constitution to the *53 narrowest possible limits of space should prevent the adoption of an enactment declaring in the strongest possible terms the interest of the State in its common schools".[3]
It is in juxtaposition to this contemporary commentary by the fathers of our education article, which, revealingly, came to be known as "the children's Bill of Rights" (2 Lincoln, Constitutional History of New York, p 206), that a sampling of the facts regarding the actual impact of the system as it now exists should be examined. For this purpose, we may well quote from the Appellate Division's excellent synopses, first, as to the four intervenor cities (Syracuse, Rochester, Buffalo and New York City) and, second, as to the many individual districts who initiated this suit.
The plight of the cities, found to be attributable to the inexorable drain of a municipal overburden[4] left unremedied by a State aid formula tied to realty resources, is at once seen in the findings that they:
"spent 28% of their tax revenues on education while jurisdictions outside the cities spent 45% * * * [and that the] huge concentration of poverty stricken gave New York City 47% of the State's pupils with special educational needs, although it had only 31% of the total public school population and received only 26% of the State's education operating aid. * * * [Trendwise], [b]y 1980-1981 New York City's percentage of the State's special needs pupils had risen to 51% as against 33% of the public school enrollment and 29% of education operating aid.
* * *

*54 [Furthermore], "[t]he State's reliance on attendance rather than enrollment figures results in a double financial penalty to the cities because of their high rates of absenteeism. * * * Because the high absentee rate is a direct consequence of poverty and underlying social conditions, its effects are inexorable and its financial effects cannot be alleviated by employment of additional attendance officers.
"The significantly higher proportion of physically, mentally and emotionally handicapped and learning impaired pupils resident in the cities and the extra personnel required to administer necessary programs compel the expenditure of greater sums to educate them. While the State aid formula provides additional weightings for handicapped students, the computation is flawed by a failure to account for municipal overburden, reduced purchasing power of city educational dollars, and high absentee rates.
* * *
"Reduced aid to the cities also impairs their abilities to instruct students who speak little or no English, although such programs are required under Federal mandate. * * * [Also] the cities have the highest concentration of occupational education students * * *. Because of their large numbers and the greater expense of the programs offered, city school districts are unable to accommodate all students requesting occupational education.
* * *
[Indicative of both inferiority and inequality], "results of national, State and local achievement tests demonstrate that unconscionable numbers of children fail to acquire basic educational skills. In Rochester, standardized tests given in 1975 revealed that 45% of the secondary school students were `educationally disadvantaged'  that is, not performing at grade level and at least two years or more *55 below level in reading  as were 58% of those students in mathematics; 16% of Rochester's twelfth grade students read fifth grade level or below. In a 1976 New York City test, 12% of the ninth grade students were found to read at fourth grade level or below. * * * These percentages translate into many thousands of high school children, some of whom are totally illiterate while others can read the words without accompanying comprehension and still others cannot apply the meager information they can obtain to problems." (83 AD2d, at pp 229-232).
The Trial Judge's summary is apt: "When the cities concentrate resources on pupils with special needs, other pupils, including those who are in fact disadvantaged but not reached by special programs, are subjected to educational deprivation * * * Many pupils attend classes in buildings which were shown to be in need of repairs and lacking in facilities for counseling, study or recreation. Pupils attending schools in the large cities were shown to be provided with less physical security in their schools; less transportation; restricted sports and extracurricular activity; inadequate library and health services and diminished offerings in art and music. In summary, the failure to provide State aid on an equitable basis deprived the children in the large city districts of an equal education opportunity" (94 Misc 2d, at pp 518-519).
Now, as to the nonintervening plaintiffs, while their problems may not be compounded by municipal overburden, they suffer from a qualitatively, if not, quantitatively related malaise produced by a daunting and difficult finance system so onerous in its effect on districts poor in realty wealth (see 83 AD2d 217, esp at pp 223-226) and so complex in its application that Justice JAMES D. HOPKINS, concurring in the majority's finding that the State is violating the State Constitution's education article, felt called upon to complain that "the design of a uniform and harmonious system conceived by its nineteenth century authors had been frustrated and distorted" into "a veritable jungle of labyrinthine incongruity", "an Ossa of confusion piled on a Pelion of disorder". (83 AD2d, at p 269.) In everyday terms, the net result is illuminated again by the Appellate Division's recitation, this time that:

*56 "The disparities in operating expenditures per pupil in 1974-1975 ranged from $4,215 for the richest district to $936 for the poorest, a ratio of 4.5 to 1 * * * Three districts in Suffolk spent more than $6,300 and four spent less than $2,300 while the ratios between some districts in Nassau and Albany Counties reached 2 to 1. The direct connection between wealth and operating expenses and total expenses is revealed by further statistics, a few of which bear mention here.
* * *
"The consequences of [such] disparities are dramatic. * * * To achieve expenditure levels to provide better educational output, low-wealth districts must tax themselves at relatively high rates, as a result of which they encounter difficulties in obtaining school budget approvals, imposition of austerity budgets which limit transportation, supplies, library and textbook purchases, and, ultimately, rises in rates of mortgage foreclosure and community instability. [See, e.g., Matter of Onteora Cent. School Dist. (Onteora Non-Teaching Employees Assn.), 56 N.Y.2d 769.]
* * *
"Low-wealth districts are unable to reduce class size and their children lose the resulting individual attention which is particularly important for both the disadvantaged and the gifted. Such districts are compelled to hire fewer non-teaching personnel as guidance counselors, psychologists and therapists and they cannot adequately provide the special attention requisite for students with severe speech and hearing impediments. Poor districts must ration their speech therapists and other ancillary services to such a degree that long waiting lists exist for these services. Also constrained by insufficient realty wealth are the offer of the number and variety of advanced placement programs (which encourage children to continue in school and provide better preparation for college) * * * Finally, the low-wealth districts experience chronic shortages of equipment and supplies.
* * *

*57 "Fund shortages also affect district ability to engage necessary teaching and administrative personnel. At the time of trial, 9 of Brentwood's 12 elementary schools were without assistant principals and the district was unable to follow the Education Department's recommendation for reducing class size in certain courses because it could not afford to hire the requisite additional staff. In Roosevelt, there were no funds for substitute teachers and 23 professional staff members had to be terminated in 1975-1976 to eliminate a budget deficit." (83 AD2d, at pp 227-229.)
Surely, if it were meet to substitute the minimized reading the majority would give the education article for the hope and promise with which the constitutional delegates wrote it, it could not be said as a matter of law that the picture painted by this proof of disparities and discriminations complied with even the undefined "minimal acceptable facilities and services" or the broadly stated "sound basic education" to which it would be thus reduced. The fact is, of course, that in this past century, as high school and college statistics show, the acceptable level of education in our country has risen, not fallen.
Responsively, the constitutional demands of our State's education article, must be deemed to have kept pace. For, while, as a practical matter, the Federal Constitution may be said to fix a floor for the rights of our people, the ceiling may be set by each State's own constitutional charter (see, generally, my dissent in Matter of Esler v Walters, 56 N.Y.2d 306, 315).[5] And, as great expounders of constitutional law, from MARSHALL to HOLMES, have always made clear, such a document's permanence rests on its adaptability to changing events (Jackson, Struggle for Judicial Supremacy, p 174).
This brings me to the unequal protection phase of this case for, as I see it, whether taken separately or in their combined effect, the guarantees of the two converging constitutional provisions here at stake preclude the unequal and inadequate public schooling which children in property poor or fiscally overburdened areas of this State must endure.
*58 On this score, suffice it to say that I am in agreement with the Appellate Division's determination that, for reasons included among those on which I have already touched, the standard of scrutiny to be brought to bear on this case was the intermediate one heretofore recognized in this State (see Matter of Fay, 44 N.Y.2d 137, app dsmd sub nom. Buck v Hunter, 439 US 1059; Matter of Lalli, 43 N.Y.2d 65, affd sub nom. Lalli v Lalli, 439 US 259; Alevy v Downstate Med. Center of State of N. Y., 39 N.Y.2d 326; Gunther, Supreme Court 1971 Term  Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1, 28, 35, 44-47).[6]
It then proceeded along an analytical path which included recognition (1) that equality of educational opportunity is an important State constitutional interest in New York (see, also, Plyler v Doe, 457 US 202, supra; Brown v Board of Educ., 347 US 483, 489), (2) that the extensive invidious disparities in the availability of this opportunity are born of the classifications based on property or fiscal wealth of the districts in which the affected children reside, (3) that preservation of local controls, the consideration the State (and now the majority here) offers for imposing the statutory plan, is so confined by what a limited local tax base will permit that its vaunted furtherance of local independence is illusory rather than real, and (4) that by *59 no means had the State shown that the local input it could achieve could not be created by less intrusive means. On these bases, it was decided, correctly I say, that the intermediate standard was an effective bar to the statutory scheme.
Finally, two related equal protection questions may be worthy of comment.
The first of these is that it is not to be assumed that the equal protection clause of the Federal Constitution was not also impinged. Although the Appellate Division, as an intermediate tribunal, thought it best to avoid the question, San Antonio School Dist. v Rodriguez (411 US 1) may leave more leeway than some believe. In Rodriguez, there was no claim that the statute malapportioned State school aid by mismeasuring the funding capacities and needs of city districts. Rather, the Supreme Court there expressly stated its concern lest the problems of the "overburdened core-city school districts" in that case be exacerbated rather than eased by recognition of the theory pressed by their plaintiffs.
The second bears on the analysis provisionally suggested in Justice WEINSTEIN'S concurring opinion  that strict scrutiny may have been an appropriate test. This formulation was premised largely on the undisputed fact that the existing education aid formulae have an adverse effect, not only on pupils from impoverished families, but also on a large percentage of the nearly 750,000 "minority" students (black, Hispanic, American Indian, Asian and others). About 110,000 are unable to participate in school effectively in English and many are illiterate in their native tongues as well.
Raised, therefore, was the spectre of an issue of discrimination involving the approximately 83% of the "minority" people who reside in the intervenor cities. Its occasion would be the inability of these cities, left bereft of the means to do so, to cope with the social and educational breakdown affecting a large group identifiable by race, country of origin or alienage. This issue, of course, is made far less tenuous, if that it ever was, by last week's Federal equal protection decision in Plyler v Doe (supra). Be that as *60 it may, however, since Justice WEINSTEIN decided to adopt the alternative of joining in the majority's rationale, which in this case would have achieved the same result, suffice it unto the day that the question needs no answer now.
In fine, poor children, no less than rich, and the Nation of which both are a part, are entitled to an education that prepares today's students to face the world of today and tomorrow. Those who took and tolled the testimony tell us that, by any standard that counts, for the multitudinous many no such educational opportunity truly exists. Understandably, then, as the Governor put it to the Legislature just the other month, "Financial inequalities in education are more pronounced than at any time in the State's history" and "There can be no disagreement that New York's school finance program must be reformed". Because, nevertheless, as the record reveals, our present method of financing education grossly distorts our ability to do so, and because I agree with the Appellate Division that it is constitutionally defective, my vote is to uphold the order of that court.
Order modified, without costs, in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[1] Briefs amici curiae have been filed. In support of the contentions of the original plaintiffs and the intervenors: a brief for the Public Education Association, the Educational Priorities Panel, the New York Civil Liberties Union, and the City Club of New York, and a brief for the Council of Churches of the City of New York, the Department of Education of the Diocese of Brooklyn, the NAACP Legal Defense and Educational Fund, Inc., and the New York Metropolitan Council of the American Jewish Congress. In support of the position of defendants: a brief on behalf of 85 school districts within the State of New York and a brief for the majority leader in the State Senate.
[2] For the year 1981-1982 there was expended $9.6 billion for public elementary and secondary education, $4 billion of State aid (the largest single item in the State budget) and $5.6 billion raised by local taxes.
[3] We are assuming that there is a significant correlation between amounts of money expended and the quality and quantity of educational opportunity provided.
[4] Although worded in terms of a challenge to the State's system for financing public education including both financial support generated by real property taxation within the local district and that received from the State in the form of State aid, we interpret the assault to be primarily focused on asserted constitutional infirmities in the provisions for State aid. No argument is advanced, for instance, that the Legislature should realign local school district boundaries to assure property-equal districts or that some other revenue-generating means should be substituted for local district real property taxation. Indeed, we have some doubt as to the jurisprudential prudence (assuming that our court would have jurisdiction to do so) of issuing any blanket declaration of unconstitutionality as to the entire system for financing public education, composed as it is of a combination of local and State-wide factors, economic and political  if for no reason other than the great difficulty of fashioning practical remedies or of implementing any such declaration. (Cf. Jones v Beame, 45 N.Y.2d 402, 406, 408-409; Matter of Abrams v New York City Tr. Auth., 39 N.Y.2d 990, 992.) Challenges to the provisions made by the Legislature for appropriation and allocation of State aid to local school districts in the light of the present geographical boundaries of such districts fixed by legislative action and of legislative authorization for local district real property taxation do present justiciable issues which call for judicial resolution.
[5] The inclusion in our State Constitution of a declaration of the Legislature's obligation to maintain and support an educational system is not to be accorded the same significance for purposes of equal protection analysis as would a counterpart reference to education in the Federal Constitution. The two documents are drafted from discretely different constitutional perspectives. The Federal Constitution is one of delegated powers and specified authority; all powers not delegated to the United States or prohibited to the States are reserved to the States or to the people (US Const, 10th Amdt). Great significance accordingly is properly attached to rights guaranteed and interests protected by express provision of the Federal Constitution. By contrast, because it is not required that our State Constitution contain a complete declaration of all powers and authority of the State, the references which do appear touch on subjects and concerns with less attention to any hierarchy of values, and the document concededly contains references to matters which could as well have been left to statutory articulation (e.g., provision for superintendence and repair of canals, art XV, § 3, scarcely to be classified a fundamental constitutional right on any view).
[6] (1894 NY Constitutional Convention Documents, Doc No. 62.) Reports by State School Superintendents and Messages by Governors to the Legislature before and after the Constitutional Convention of 1894 with recommendations relative to legislative enactments with respect to the State's educational system, while informative, are nevertheless irrelevant to an interpretation of the language of the constitutional enactment (e.g., 1877 NY Assem Doc No. 11; 1889 NY Assem Doc No. 7; 1894 NY Assem Doc No. 42; 1895 NY Assem Doc No. 34; 1897 NY Assem Doc No. 71; 1898 NY Assem Doc No. 64; 5 Lincoln, Messages from the Governors, p 852; 9 Lincoln, pp 15-16, 549). What was then, and what over the years since, has been urged on the Legislature as sound educational policy is to be clearly distinguished from the command laid on the Legislature by the Constitution.
[7] We observe that in the constitutional prescription the connotation of "system" is attached to education  "a system of free common schools"  not to maintenance and support. Thus, once it is concluded that there is an educational system in New York State which comports with the constitutional requirement, it is immaterial that the Legislature in its wisdom has seen fit to provide financial support under complex formulas with a variety of components, even were it to be concluded that the maze of financial support measures was not entitled itself to be characterized as a "system".
[8] Decisions in other jurisdictions upholding existing State school financing systems against claims of violation of equal protection clauses or education provisions of State Constitutions or both include the following (the educational requirement of the State Constitution, when considered, is quoted with the citation): Lujan v Colorado State Bd. of Educ. (649 P2d 1005 [Col] ["a thorough and uniform system of free schools"]); McDaniel v Thomas (248 Ga 632 ["an adequate education for the citizens of Georgia"]); Board of Educ. v Walter (58 Ohio St 2d 368, cert den 444 US 1015 ["a thorough and efficient system of common schools"]); Olsen v State ex rel. Johnson (276 Ore 9 ["a uniform, and general system of Common schools"]); Thompson v Engelking (96 Idaho 793 ["a general, uniform and thorough system of public, free common schools"]); State ex rel. Woodahl v Straub (520 P2d 776 [Mont]); Shofstall v Hollins (110 Ariz 88 ["a general and uniform public school system"]).

Among those cases sustaining one or both of such challenges are Washakie County School Dist. No. 1 v Herschler (606 P2d 310 [Wyo] [denial of equal protection]); Horton v Meskill (172 Conn 615 [denial of equal protection and violation of constitutional article, "free public elementary and secondary schools"]); Serrano v Priest (5 Cal 3d 584 [denial of equal protection]); Robinson v Cahill (62 NJ 473, cert den sub nom. Dickey v Robinson, 414 US 976 [denial of equal protection and violation of constitutional article, "a thorough and efficient system of free public schools"]).
[9] The dissent illustrates the very great, and perhaps understandable, temptation to yield to a result-oriented resolution of this litigation. Universal acceptance of the central role of education in our society today is unquestioned.

The dissenter, however, misapprehends the issue before us on this appeal. It is not whether education is of primary rank in our heirarchy of societal values; all recognize and support the principle that it is. It is not whether there are great and disabling and handicapping disparities in educational opportunities across our State, centered particularly in our metropolitan areas; many recognize and decry this state of affairs. The ultimate issue before us is a disciplined perception of the proper role of the courts in the resolution of our State's educational problems, and to that end, more specifically, judicial discernment of the reach of the mandates of our State Constitution in this regard. The expostulation of the dissenter, and the urgings of those who would alleviate the existing disparities of educational opportunity, are properly to be addressed to the Legislature for its consideration and weighing in the discharge of its obligation to provide for the maintenance and support of our State's educational system. Primary responsibility for the provision of fair and equitable educational opportunity within the financial capabilities of our State's taxpayers unquestionably rests with that branch of our government.
As we wrote in Montgomery v Daniels (38 N.Y.2d 41, 53, supra): "It is not our office to rejoice or to lament. A fair regard for the basic polity of separation of powers dictates judicial respect for the proper role of the legislative branch, and pride in the uniquely and essentially neutral role of the judicial branch. That judicial role is both a privilege and a limitation." It would neither serve the purposes of orderly government nor honor the role of the judiciary to lay aside standards of judicial review recently held appropriate (in decisions in which the dissenter joined) because in this instance corrective measures may, in the view of many, be much needed with respect to the provision of financial support for our educational system.
[1] Justice SMITH held that the equal protection clauses of both the Federal and State Constitutions were implicated as to the intervenor cities. The Appellate Division, however, for its equal protection rationale, relied on the State Constitution alone.
[2] Then Governor Fenton too told the delegates, "Our people have acted upon the theory that the extension to every class and condition of society, of the means of early education, and facilities for the acquisition of knowledge in after life, contributes to the prevention of crime, the preservation of the social order, the security and stability of the government, and the thrift and prosperity of all who are engaged in the various departments of industry".
[3] The education clause, more matter-of-factly, but still tracking this more amplified language, reads: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated" (NY Const, art XI, § 1).
[4] Municipal overburden is a condition in which "`[s]ome areas, particularly urban areas, have exceptionally high non-educational expenses * * * [so that] revenues raised by property taxes which might otherwise be used for education, must be diverted to non-educational purposes'" (Robinson v Cahill, 69 NJ 449, 466, n 5). In the present case, the cities suffer from "high concentrations of the poor and elderly, large numbers of public assistance and public health recipients, high unemployment and low educational attainment, high crime rates, professional rather than volunteer fire departments, costly correctional facilities, mass transit problems, higher park and recreation expenses, subsidization of public housing, higher construction costs for new schools, deterioration of infrastructure, plus a myriad of other noneducational costs mandated by State law in connection with city employees * * *. The severity of the problems is illuminated by the fact that, with 43% of the State's population, New York City had 70% of the State's public assistance recipients, who constituted 12½% of its residents as compared to 3.6% in the rest of the State. The city had 67% of the State's Medicaid claimants and spent $51 per capita in contrast to $15 in the rest of the State" (83 AD2d, at pp 229-230). Ironically, though intended to redress the rural and property poor gap, the simplistically conceived "equalization" formulae are the cause of a perverse disequalization effect on education in the presumably property rich cities.
[5] As Judge JON. O. NEWMAN of the United States Court of Appeals recently put it at a symposium bearing the descriptive title, "The Rediscovery of the Connecticut Constitution: Broadening Protections for Individual Rights", "Within the grand design of the `old federalism' there is room for a little chemistry to be practiced by state court judges construing the fundamental legal document of their state  the state constitution. Perhaps the discipline is more akin to alchemy, for it seems very likely that the leaden language of many state constitutional provisions is waiting to be turned into the pure gold of vital protections of individual rights".
[6] Matter of Levy (38 N.Y.2d 653), in which I joined, is to be distinguished from the present case. Levy involved no more than a dispute of very limited dimension in the course of which there was raised an issue over the rationality of a provision for "relieving the parents of blind and deaf children from any financial responsibility in connection with their children's education while at the same time requiring parents whose children are otherwise handicapped to contribute to the maintenance component of educational expenses" (supra, at p 658). Largely on historical grounds, in the main because the plight of the blind and deaf became a societal concern before those otherwise handicapped, the court found a rational basis for the differentiation and declined to require a broadening of the maintenance program. In sharp contrast, what plaintiffs here  including a mass of disadvantaged children  primarily seek is nondiscriminatory distribution of the moneys the State already makes available. As already indicated, that it is most appropriate, and indeed urgent, for the courts to grant this relief by enforcing our Constitution has been the view of every New York Judge who has had occasion to pass on this case up to this point.